Paul H. ROBINSON, et al., Plaintiffs,

v.

STATE OF NEW JERSEY, Thomas H. Kean, Governor, et al., Defendants.

Joseph W. ANTONACCI, et al., Plaintiffs,

v.

STATE OF NEW JERSEY, Thomas H. Kean, Governor, et al., Defendants.

Civ. A. Nos. 82–1118, 82–1119.

United States District Court, D. New Jersey.

Sept. 28, 1982.

---

Henry Stein, Stein & Shapiro, Medford, N. J., Nelson R. Kieff, National Right to Work Legal Defense Foundation, Springfield, Va., Jeffrey Cooper, Philadelphia, Pa., for plaintiffs.

Irwin I. Kimmelman, Atty. Gen., State of N. J. by Eugene J. Sullivan, Asst. Atty. Gen., Alfred E. Ramey, Jr., Deputy Atty. Gen., Trenton, N. J., for defendant Thomas H. Kean, Governor of the State of N. J.

Sidney H. Lehmann, Gen. Counsel, Robert E. Anderson, Jr., Deputy Gen. Counsel, Public Employment Relations Com'n, Trenton, N. J., for defendant James W. Mastriani, Chairman, Public Employment Relations Com'n.

Edward F. Ryan, Carpenter, Bennett & Morrissey, Newark, N. J., for defendant Rutgers University.

Mark D. Schorr, Sterns, Herbert & Weinroth, P. A., Trenton, N. J., for defendants Rutgers Council of American Ass'n of University Professors Chapters, Sandra Walther, Richard Peskin and Richard Laity.

Cassel R. Ruhlman, Jr., Ruhlman & Butrym, Pennington, N. J., Robert H. Chanin, James J. Brudney, Bredhoff & Kaiser, Washington, D. C., for defendant New Jersey Educ. Ass'n.

## OPINION

DEBEVOISE, District Judge.

### I.  *The Proceedings*

These two consolidated actions each challenge the constitutionality of provisions of the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A–1, *et seq.* (the Act), which permit public employers to withhold and majority union representatives to receive representation fees assessed against employees who are not members of the union.  Plaintiffs moved for preliminary injunctive relief; a hearing was held; and this opinion constitutes my findings of fact and conclusions of law.

### II.  *The Statute*

The Act creates a Division of Public Employment Relations within the executive branch, N.J.S.A. 34:13A–5.1, and establishes in that division a New Jersey Public Employment Relations Commission (PERC), N.J.S.A. 34:13A–5.2.  PERC is required "to make rules and regulations" and to implement fully all the provisions of this act".  PERC is granted exclusive jurisdiction over unfair practices, N.J.S.A. 34:13A–5.4 c.  The Act grants and protects the right to freely join or assist or to refrain from joining or assisting any employee organization, N.J.S.A. 34:13A–5.3, and prohibits restraint of those rights, N.J.S.A. 34:13A–5.4(a)(1) & (b)(1).

The Act designates the majority representative the exclusive representative to negotiate the terms and conditions of employment of an employee unit, N.J.S.A. 34:13A–5.3 (¶ 2).

A majority representative of public employees in an appropriate unit shall be entitled to act for and to negotiate agreements covering all employees in the unit and shall be responsible for representing the interest of all such employees without discrimination and without regard to employee organization membership ...  In addition, the majority representative and designated representatives of the public employer shall meet at reasonable times and negotiate in good faith with respect to grievances and terms and conditions of employment.

When an agreement is reached on the terms and conditions of employment, it shall be embodied in writing and signed by the authorized representatives of the public employer and the majority representative.

Effective July 1, 1980, New Jersey amended the Act to permit public employers and majority representatives of employ-

ees to negotiate contract provisions which would require employees who choose not to join the majority representative to pay a representation fee in lieu of dues. P.L. 1979, c. 477, N.J.S.A. 34:13A–5.5 to 5.9. The purpose of the amendment was to require the non-members to bear a fair share of the expenses incurred in representing their interests during negotiations with their employer. The Sponsor's Statement to Assembly Bill No. 688, February 9, 1978, expressed this objective as follows:

> For many years, the 'New Jersey Employer-Employee Relations Act' has required that a majority representative of public employees which has negotiated a labor agreement covering such employees to represent the interests of *all* employees in the bargaining unit, regardless of organizational membership, without discrimination. Non-members of the majority organization, therefore, enjoy virtually equal benefits and protections without sharing in the costs, incurred by collective negotiations, grievance representation, and other services. In the recent May, 1977 decision of the United States Supreme Court (*Abood et al. v. Detroit Board of Education et al.* [431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261]) which upheld the constitutional validity of state 'agency shop' legislation, the Court pointed to the fact that the tasks of negotiating and administering an agreement are continuing and difficult ones and entail the expenditure of much time and money, often requiring the services of lawyers, expert negotiators, economists, research staff, as well as administrative personnel. In that decision, the Court went on to state that 'a union shop arrangement has been thought to distribute fairly the cost of these activities among those who benefit, and it counteracts the incentive that employees might otherwise have to become 'free riders'—to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees' Many analysts feel that union security agreements such as the agency shop are vital to the stability and sense of responsibility of public sector unions.

N.J.S.A. 34:13A–5.5(a) authorizes a majority representative and a public employer to include in a collective agreement a provision requiring all employees in the negotiations unit who are not members of the majority representative to pay the majority representative a representation fee in lieu of dues for services rendered by the majority representative. N.J.S.A. 34:13A–5.5(b) provides that the representation fee "shall be in an amount equivalent to the regular membership dues, initiation fees and assessments charged by the majority representative to its own members *less* the cost of benefits financed through the dues, fees and assessments and available to or benefitting only its members, *but in no event shall such fee exceed 85% of the regular membership dues, fees and assessments*". (Emphasis added.) The Act does not define benefits available to or benefitting only the majority representative's members. However, the Statement of the Assembly Labor Committee to Assembly Bill No. 688, June 19, 1978, referred to the cost of any other benefits available only to members and gave as examples "contributions to charitable or religious organizations or causes; fines, penalties or damages arising from unlawful activities of a bargaining agent; social or recreational activities, costs of educational activities unrelated to collective negotiations, contract administration or lobbying for improved wages and benefits; costs of medical insurance; retirement benefits or other benefit programs; and costs incurred by the bargaining agent to organize employees who are not included in the bargaining unit".

It would appear that in arriving at the representation fee it is not required (although it would be permissible) to deduct from membership dues the employee's pro rata share of expenditures by the majority representative for political or ideological causes or for lobbying. That subject is covered in N.J.S.A. 34:13A–5.5(c).

That section provides that "[a]ny public employee who pays a representation fee ... shall have the right to demand and

receive from the majority representative . . . a return of any part of that fee paid by him which represents the employee's additional pro rata share of expenditures by the majority representative that is either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment or applied toward the cost of any other benefits available only to members of the majority representative". A payor of a representation fee does *not* have the right to demand a refund of his pro rata share of "the costs of support of lobbying activities designed to foster policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through collective negotiations with the employer". Thus there is potentially a very broad area of lobbying activities for which the funds of non-members can be spent without the right to a refund. This gives rise to one of the areas of controversy in this case.

The public employer deducts the representation fee from the paychecks of non-members and forwards the deductions to the majority representative. N.J.S.A. 34:13A–5.6.

N.J.S.A. 34:13A–5.6 prohibits the deduction of representation fees unless the majority representative has established and maintained a demand and return system which provides pro rata returns as described in N.J.S.A. 34:13A–5.5(c). The majority representative's demand and return system must include a provision permitting non-members to obtain review of the amount returned through full and fair proceedings. The majority representative bears the burden of proof. N.J.S.A. 34:13A–5.6. If dissatisfied with the result of demand and return system proceedings, a representation fee payer may appeal to a three-member board whose members the Governor appoints with the Senate's advice and consent. N.J.S.A. 34:13A–5.6. One member of this board must be a representative of public employers, one a representative of public employee organizations, and one, the strict-

ly impartial chairman, is the representative of the public interest.

Issues in this case include (i) whether any demand and return system can validate a compulsory non-member fee, part of which is used until the time of its return to promote organizations and causes with which the non-member disagrees and (ii) whether, if some forms of demand and return systems are valid, this particular system is invalid because it places such onerous burdens on the non-member seeking a refund. An examination of the facts developed in the consolidated cases now before the Court throws light upon these issues.

### III. *Robinson v. New Jersey*

Plaintiffs in the *Robinson* case are thirteen professional employees of defendant Rutgers University. They are not members of defendant Rutgers Council, American Association of University Professors (AAUP), which acts as exclusive representative of the employees in the bargaining unit of which plaintiffs are a part.

Defendants in *Robinson* include the State of New Jersey and its Governor, the Chairman of PERC, Rutgers University and its Board of Governors and various of its officers having labor relations duties, the Rutgers Council of AAUP and various of its officers, and the National AAUP and its General Secretary.

Extensive affidavits have been filed by or on behalf of plaintiffs and defendants and there can be little, if any, dispute as to the facts pertinent to the disposition of the application for a preliminary injunction.

AAUP is a national organization of teachers and research scholars in universities and colleges and in professional schools of similar grade. Its governing body is a Council whose members are certain present and past officers, the Chairman of the Collective Bargaining Congress and thirty elected members. The Council establishes membership dues, subject to ratification at the annual meeting of AAUP.

Whenever the active members of AAUP in a given institution numbers seven or

more, they may become a chapter of AAUP. A chapter may establish local membership dues.

According to AAUP's chief executive officer, "AAUP is not, and has never been, a national labor organization. It does not engage in collective bargaining on behalf of anyone. In 1973, the AAUP Annual Meeting endorsed collective bargaining as a legitimate way to achieve the Association's goals, and agreed to provide assistance in pursuing collective bargaining to local chapters." (Spitzberg Aff., ¶¶ 3, 4.)

AAUP requires that collective bargaining chapters which collect agency shop fees (representation fees) be required to transmit to the national organization an amount equal to full national dues "or a prorated share based on local assessments" (Spitzberg Aff., ¶ 7). According to AAUP's chief executive officer, "[l]ocal chapters of the AAUP engaged in collective bargaining have full responsibility for the negotiation and implementation of their collective bargaining agreements," but nevertheless "[v]irtually all activities of the AAUP support the efforts of its local chapters engaged in collective bargaining" (Spitzberg Aff., ¶¶ 8, 9).

Be that as it may, an examination of the record demonstrates that National AAUP engages in at least some lobbying at the federal and state levels [1] and that significant funds are spent for activities which the Statement of the Assembly Labor Committee to Assembly Bill No. 688, June 19, 1978 gave as examples of benefits available only to members, e.g., costs of educational activities unrelated to collective negotiations and costs incurred to recruit members.

There is a Rutgers Council of AAUP Chapters (Rutgers AAUP) serving as the negotiating representative for faculty members and teaching and graduate assistants at Rutgers, The State University. The constituent chapters of the Council are located at Camden, Newark and New Brunswick. An Executive Council has the responsibility to establish dues subject to approval of the membership.

In early 1980, after enactment of the amendments to the Act but before the effective date of the amendments (July 1, 1980), Rutgers AAUP sought and obtained from its legal counsel advice as to how it should proceed to take advantage of the new provisions. Counsel advised that it would be proper to negotiate an agreement requiring a representation fee provided the agreement did not become effective before July 1, 1980. As to calculating the representation fee, counsel recommended that first it was necessary to compute all dues and other charges assessed against members, including membership dues in the national organization if such membership was required of all members. Then, counsel advised, two categories of expenses had to be deducted to determine what amount could

---

1. For example, in the October, 1980 issue of AAUP's house organ, Academe, there appeared the following under Report of Committee R on Government Relations, 1979–1980:

During the five years I have served as chairman of Committee R, I have watched our Association move from a short agenda of legislative issues, primarily related to student assistance programs, to a larger and more comprehensive agenda which now encompasses a broad range of issues involving both the legislative and executive branches of the federal and state governments ... Our collective voice is heard in Congress and the White House and, not surprisingly, we have an impact on policies affecting the academic community. We contribute an important element of expertise to debates over crucial issues involving higher education, and in so doing we have seen a measurable improvement in the quality of both the debate and resultant legislation.

There follows in this single issue of Academe a description of the subjects on which AAUP lobbied, none of which appear to have any direct bearing on the negotiations between Rutgers AAUP and Rutgers University, e.g., the then new federal Department of Education, the FY 1980 and FY 1981 federal budgets, reauthorization by Congress of the Higher Education Act, federal intelligence legislation, amending the National Labor Relations Act to guarantee the right of faculty to organize and bargain collectively. ["We have begun planning the major lobbying effort which will be necessary to win Congressional approval of the legislation."] All of these subjects involve controversies about which faculty members and other citizens can and do have widely divergent views.

be charged to non-members: (i) amounts spent in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment[2] and (ii) amounts expended for benefits available only to members of the majority representative.

Counsel advised that not all expenses for lobbying activities should be excluded from the representation fee: "Other political activities, of a nonpartisan or nonideological nature should, however, be included. As the bill itself notes, chargeable items should include 'the cost for support of lobbying activities designed to foster public policy goals and collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through collective negotiations with the public employer' . . . [T]he union should not exclude sums spent on such activities as testimony before legislative finance committees, mailings to citizens seeking support of union demands or other political activities directly related to collective bargaining."

To provide guidance to Rutgers AAUP in determining what constituted member-only benefits counsel listed (with two exceptions) the kinds of expenditures which were set forth in the Assembly Labor Committee Statement referred to above. Counsel noted that the statement had listed among the member-only benefits expenses to administer the contract and for lobbying. However, counsel observed that after the presentation of the Assembly Labor Committee Statement the proposed amendment to the Act had been revised specifically to permit such expenses to be included in the representation fee.

Counsel noted that under the statute the representation fee could not exceed 85% of charges to members and then stated: "Experience in other states has demonstrated that an 85% fee is defensible; therefore we suggest that that amount be the established representation fee." This is a somewhat surprising recommendation. The opinion letter had gone on for several pages to urge meticulous record-keeping and had defined carefully just what expenditures should and should not be included in the representation fee. To then recommend reliance on totally unidentified and unanalyzed "experience in other states" which had proved to be "defensible" seems inconsistent with all the preceding advice.

In any event, in the spring of 1980 Rutgers AAUP prepared to negotiate for contract provisions requiring payment of a representation fee. In May, 1980, before such an agreement had been negotiated, the Rutgers AAUP Council adopted a budget for fiscal year 1980–81 based entirely on member revenue. The budget anticipated total revenues of $167,500 from which there was deducted $45,000 representing National AAUP dues, for net revenues for the use of Rutgers AAUP of $122,500. Total expenditures were projected at $125,879.

In early June Rutgers AAUP's Executive Director advised the President and President-Elect that an "expanded" budget should be prepared in anticipation of receipt of additional revenues, in the form of representation fees; that expenditures should be separated so as to identify those benefitting members-only and those benefitting all persons in the bargaining unit, and that a representation fee should be established.

---

2. I conclude that N.J.S.A. 34:13A–5.5(b) requires that in computing the representation fee there need be deducted from the amount of the members' dues only the cost of benefits available only to members. The cost of expenditures for causes in aid of activities of a partisan political or ideological nature need not be deducted in the first instance. They are recoverable under the demand and return system provided for in N.J.S.A. 34:13A–5.5(c). Obviously, from the perspective of the non-member who

does not wish to have any portion of his fee used for political or ideological purposes it is preferable that such portion never be taken from him at all rather than having to pay that portion and then having to institute proceedings to compel its return. The procedure recommended by Rutgers AAUP's counsel, while perhaps not mandated by the statute, would have had the effect of avoiding the necessity to pursue the demand and return procedure.

In response to the Executive Director's suggestions committees were appointed to make recommendations as to a revised dues structure and as to a new budget which would reflect the receipt of representation fees. These two committees reported to the Council's July 30, 1980 meeting.

The budget committee anticipated that $157,100 would be received in representation fees (almost doubling the income projected in the May, 1980 budget) and proposed how that amount should be spent. It proposed adding to the May membership-only budget the following:

$ 16,000 additional legal expenses;
$ 3,750 additional temporary office help;
$ 10,950 additional administration expenses;
$126,400 additional program expenses.

The new programs were to be:

| | |
|---|---:|
| Subscriptions | $ 600 |
| Grievance support services | 26,800 |
| Newsletters and printing | 2,500 |
| Released time for AAUP President | 8,000 |
| Computer services | 2,500 |
| Travel and meetings | 2,500 |
| Special programs | 1,000 |
| Health and occupational safety study | 3,000 |
| Contingency fund | 7,000 |
| National services (*i.e.*, payment to National AAUP) | 72,500 [3] |
| Total . . . | $126,400 |

The Council adopted the proposed supplemental budget with certain modifications. At the same meeting the Council voted to set the dues for members of Rutgers AAUP at 4% of base salary and non-member representation fees at 85% of member dues (3.4% of non-members' base salary). The dues

were computed after the budget was struck. In the words of the Executive Director: "The dues figure was arrived at only after a computer analysis of all existing salaries in the unit as of spring 1980 [4] and the total salary for the unit, which was later increased by seven percent to reflect July 1, 1980 raises as a result of the negotiated contract. Generally, the Council had attempted to arrive at the lowest fee schedule possible to fund the base—specifically, this amounts to 0.4 percent of salary for members and 85 percent times 0.4 percent (0.34 percent) for non-members."

Although the report of the budget committee lists a few expenditures under the heading "Budget for Members-only Expenditures", there does not appear to have been any serious analysis of expenses for the purpose of determining what portion constituted expenses for the benefit of members-only or what constituted expenses in aid of political or ideological causes. As to the new item of $72,500 to be paid to National AAUP, the budget committee's report contains only the explanation that: "The National Service fee is that portion of National member dues and a portion of the non-member fee that National can justify according to the requirements of the New Jersey Statute. For this budget, the amount is estimated as $25.00 per faculty person in the *unit*." This was a rather fragile base on which to structure a computation of representation fees. The fragility of the base is emphasized when one considers that before the adoption of this budget membership in Rutgers AAUP was permitted (in violation of the National's rules) even though a person did not pay dues to National AAUP. Under the new budget membership in the National organization was made compulsory and Rutgers AAUP paid in a lump sum from its total receipts

3. I am not able to ascertain from the record whether this payment of $72,500 to National AAUP is in addition to the $45,000 payment representing National AAUP dues shown in the May, 1980 membership-only budget.

4. The affidavit submitted by AAUP's Executive Director stated that there are 3700 persons in the unit represented by AAUP (Walther Aff.,

¶ 2). The report of the special budget committee stated that as of February 2, 1980 the unit consisted of 1351 members of Rutgers AAUP and 2572 non-members. The total is somewhat larger than the total given by the Executive Director, but this may be explainable by the fact that different dates were involved.

its members' National AAUP dues and a portion of the representation fees. The effect of this method of payment, of course, was to increase the base on which representation fees were computed.

It is quite apparent that there was no analysis of either the Rutgers AAUP budget or the National AAUP budget along the lines recommended by counsel for Rutgers AAUP to determine the categories of expenditures referred to in the amendment to the Act. Rutgers AAUP proceeded on the assumption that whatever the amount of the expenditures of the local and National AAUP which could not be charged to non-members, they were less than 15% of total expenditures.

I have no doubt that it would be a major operation to perform the allocations required to insure compliance with the Act. It would require a knowledge of the meaning of the Act; it would require complete knowledge of the functions of each local and National employee and of the purposes of all non-employee related expenditures; it would require allocating all expenditures between the different categories contemplated by the Act. It is not surprising, therefore, that the rule-of-thumb figure of 85% of dues payments (the statutory maximum) was adopted as the amount of the representation fee for budget purposes.

In October, 1980 the Rutgers AAUP Council was advised that Rutgers had agreed to include in the agreement provisions for a representation fee. The provisions read as follows:

## VI—REPRESENTATION FEE

1. Representation Fee Deduction

   The parties agree that effective January 1, 1981 all employees in the bargaining unit who do not become members of the Rutgers Council of AAUP Chapters shall have deducted from their salaries and forwarded to the AAUP a representation fee in a manner and in an amount as provided below.

2. Representation Fee Amount

   At least thirty (30) days before the effective date of the representation fee, or any subsequent modification thereof, the AAUP shall notify the University of the representation fee sum to be deducted from non members' salaries. Any change in the representation fee shall be made upon written notification to the University.

3. Representation Fee Deductions

   The representation fee shall be deducted from non-members' salaries in equal bi-weekly installments. Representation fee deductions from the salaries of all non-member employees shall commence on or after but in no case sooner than the thirtieth (30th) day following the beginning of an employee's employment in a bargaining-unit position or the tenth (10th) day following re-entry into the bargaining-unit for employees who previously served in bargaining-unit positions and who continued in the employ of the University in a non-bargaining-unit position. For the purpose of this Article, academic-year employees shall be considered to be in continuous employment.

   If, during the course of the year, the non-member becomes an AAUP member, the University shall cease deducting the representation fee and commence deducting the AAUP dues after written notification by AAUP of the change in status. Conversely, if, during the course of the year, the AAUP member directs the University to cease AAUP dues deductions in a manner appropriate under the terms of the dues check-off agreement, the University shall commence deduction of the representation fee after written notification by the AAUP of the change in status. After deduction, representation fees shall be transmitted to the AAUP in the same manner and in the same time as AAUP dues.

4. Indemnification

   The AAUP hereby agrees to indemnify, defend, and save harmless the University from any claim, suit or action, or judgments, including reasonable costs

of defense which may be brought at law or in equity, or before any administrative agency with regard to or arising from the deduction from the salaries of any employee of any sum of money as a representation fee under the provisions of the Agreement.

The contract was ratified by the membership to take effect January 1, 1981.

On November 20, 1980 the Council adopted a demand and return system. The system was described in the December, 1980 Rutgers AAUP newsletter:

DEMAND AND RETURN SYSTEM

The following procedure was adopted by the Executive Council of the Rutgers Council of AAUP Chapters on November 20, 1980 to comply with the requirements of Section 2C of Chapter 477, Laws of 1980. Please retain it for your records.

Any person who makes representation fee payments in lieu of dues who objects to the expenditure of any portion of such payments in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment or applied toward the cost of benefits available only to members of the Association shall have the right to dissent from such expenditure. An objector shall file written notice of an objection by certified mail to the Representative Fee Review Committee ("Committee") care of the Executive Director of the AAUP.

Objections to expenditures made in any fiscal year must be raised by October 1st of the following year. Individuals not represented by the AAUP at the beginning of the fiscal year may raise such objections within ninety (90) days of the date such representation commences.

An objection may be renewed for each year by written notification as noted above. At least annually, the Association shall cause notice of its Demand and Return system including the dates for notice of objection to be printed in its newsletter.

The Executive Director shall promptly submit each objection received to the Committee which shall consider the objection for timeliness of submission and on the merits. The Committee shall be composed of three members of the faculty of Rutgers University chosen by the Executive Council of the Rutgers Council of AAUP Chapters. If the AAUP contests the objection, it shall respond to the objection in writing within 15 working days of its transmittal to the Committee. Upon receipt of the AAUP response, if any, the Committee shall determine if additional information is necessary to complete the record. It may, in its absolute discretion, seek additional information from the objector or the AAUP or hold a fact-finding hearing. When the Committee is satisfied that it has sufficient facts to rule, it shall close the record. The Committee shall rule on the objection within 15 working days of the close of the record and shall notify all parties. The burden of proof shall be placed on the AAUP throughout the proceeding.

If the objector is dissatisfied with the decision of the Committee, he or she may appeal to the State Representative Fee Review Board provided for in Chapter 477, Laws of 1980.

Representation fees became payable commencing January 1, 1981. Rutgers AAUP's Executive Director established two budgets, one for what was deemed to be representation expenditures and the other for member-only expenditures. The former category of expenditures was financed entirely from income from non-members matched with 85% of the income from members' dues. The balance of the members' contributions went to members-only activities. The Executive Director is of the opinion that there were included in the representation budget only items permissible under the Act. This included "lobbying for legislation affecting terms and conditions of employment of unit members ... [These lobbying activities] center almost exclusively on such issues as pensions, medical coverage for members and legislation affecting the

scope of collective negotiations." (Walthers Aff., ¶ 17.) Whether there was a proper allocation of expenditures is, of course, a major issue between the parties to this action.

Plaintiffs are in disagreement with the representation fee system. One of them, Michael Crew, had been President of the Newark Chapter of AAUP, a member of the Rutgers AAUP Executive Council and a member of the special budget committee. He resigned in December, 1980 to protest use of the representation fee law and requiring non-AAUP members to support lobbying and other activities which they oppose.

A number of the plaintiffs pursued the procedures for a return of portions of their representation fees which they believed were being used for improper purposes. The experiences of plaintiff Robinson are typical of the experiences of the others who sought a return of portions of their withheld fees.

Robinson received a December 1, 1980 letter from Rutgers AAUP inviting him to join and advising him that in any event he would be required to pay a representation fee of 85% of AAUP dues. On January 13, 1981 Robinson wrote to the Rutgers personnel office objecting to the withholding of the representation fee and on January 14, 1981 he wrote to the AAUP's Representation Fee Review Committee expressing similar objections and asserting his opinion that less than 5% of the AAUP budget expenditures dealt with contract negotiations.

On January 22, 1981 Rutgers AAUP's Executive Director sent Robinson a form to be submitted to the Fee Review Committee and advised that a filing making a claim with respect to the fiscal year ending June 30, 1981 would be timely until October 1, 1981. The form stated that certain categories of expenditures are subject to return, namely:

1. Payments in aid of activities of a partisan political nature.
2. Payments in aid of causes of a partisan political nature.
3. Payments in aid of activities or causes of an ideological nature only incidentally related to terms and conditions of employment.
4. Payment toward costs of benefits available only to AAUP members.

The form then asked that the applicant indicate for which categories of those expenditures he believed AAUP used his representation fees and directed the applicant to "state your reason and/or information base for the charge".

Unbeknownst to Robinson, the Fee Review Committee had just been appointed in January, 1981 and was not to meet until May 7, 1981. However, on January 27, 1981 he wrote to the Executive Director, with a copy to the Fee Review Committee, stating, in part:

I believe you have already received my letter of January 14, 1981 to the Representative Fee Review Committee, care of the Executive Director, as directed by your *Reports,* Vol. 11, No. 5. I enclose another copy. I believe that that letter is adequate under Chapter 477 to file a claim under Demand and Return.

I might add that I do not agree with your claim, implicit in the form you have devised, that the return and demand system is limited to the four kinds of expenditures you note. It is even more clear that the form is also deceptive in suggesting that a non-member must give 'reasons and/or information basis for the charge.' Chapter 477 makes it clear that *the burden is at all times on majority representative.* It is for the AAUP to justify its claim that 85% of union dues are eligible for inclusion under the 'fair share fee.'

On May 7, 1981 the Fee Review Committee met to consider the various demands filed with it. It accepted Robinson's January 14, 1981 letter as a proper challenge to the representation fee and so notified him. After deciding which challenges would be accepted for filing the Committee deferred further action until it received the audit of AAUP expenditures for the fiscal year ending June 30, 1981.

The audit became available in September, 1981 and the three Fee Review Committee members reviewed it and concluded that it "clearly delineated" expenditures for members-only activities and those for all members of the unit (Hillson Aff., ¶ 13). The Committee's review could not be completed until information was received from National AAUP as to expenditures of its funds. This was not received until March, 1982, more than a year after Robinson filed his claim and more than eight months after the close of the fiscal year with respect to which his claim was filed.

It is not disclosed in the record just what data National AAUP furnished the Fee Review Committee. Whatever the data was, the Chairman of the Committee recites that "Upon review, the Committee was satisfied that no part of the representation fee forwarded to the National had gone for impermissible purposes ...." (Hillson Aff., ¶ 14).

By letters dated March 8, 1982 (but sent near the end of the month) the Fee Review Committee advised each claimant that his claim had been rejected. These letters read as follows:

Dear Professor:

The Representation Fee Review Committee has completed its consideration of your objection to the collection and expenditures of the Representation fee you paid to the Rutgers Council of AAUP Chapters during the period of January 1981 through June 30, 1981.

The Committee finds that it must reject your claim against the 1980–81 fiscal year expenditures.

An 85% Representation fee is the legal maximum under New Jersey law. Our analysis of the audited local AAUP budget for FY 80–81 (available at the AAUP office—Building 4103 Kilmer 8:30 to 4:30 Monday thru Friday) and National expenditures (see attached letter from Stephen Finner) demonstrates that expenses (both Local and National) accruing to members *only* are less than 15% of total expenditures. Therefore there is no prorata refund of non-permissable expenditures due you.

If you are dissatisfied with this finding, you have the right to appeal to the State Representative Fee Review Board, as provided for in Chapter 477, laws of 1980.

Please note that you may file an objection against the collection and expenditures of the current fiscal year (July 1, 1981 to June 30, 1982) until October 1, 1982.

---

Committee Chair

The letter from Stephen Finner to which reference was made in the rejection letters purports to recite the percentage of the National AAUP budget which is allocated to various purposes during the applicable period:

No expenditure for political or ideological purposes.

18% for academic freedom and tenure activities.

11% for economic status of the profession activities.

18% for collective bargaining development expenses.

16% for conference and Chapter development.

7% for governmental relations.

8% for other Committee activities (e.g., academic governance, status of women in the profession).

2% for organizing and membership recruitment.

20% for membership accounting, membership services, and association administration.

After reciting these percentage allocations Mr. Finner concluded "For your information, National dues were $47 in calendar year 1981. Thus, expenditures for allowable purposes were in excess of representation fees received." How Mr. Finner arrived at his "thus" and reached this conclusion escapes me, but apparently he satisfied the Rutgers AAUP Fee Review Committee.

As the Fee Review Committee's rejection letters noted, the claimants had a right under the Act to appeal to the three-member Board appointed by the Governor pur-

suant to N.J.S.A. 34:13A–5.6. None of the AAUP claimants elected to pursue this option and instead instituted this suit. A description of the Board and its workings will be set forth in the next section of this opinion, as certain of the plaintiffs in the *Antonacci* case did seek relief in that forum.

#### IV. *Antonacci v. New Jersey*

The ten plaintiffs in this case are non-union teachers employed by one or another of the defendant boards of education—Westfield, Pascack Valley Regional, Edison Township, Ridgewood, and Township of Ocean.

In addition, plaintiffs named as defendants each local education association (of teachers) and its president and the affiliated County education association. Certain superintendents of education and presidents of boards of education were joined as defendants.

Also named as defendants were the New Jersey Education Association and its president and the National Education Association and its president.

State government defendants consisted of the State of New Jersey and its Governor and James W. Mastriani, Chairman of PERC.

As in the *Robinson* case, the *Antonacci* plaintiffs attack the constitutionality of the amendments to the Act permitting the withholding of representation fees from their salaries.

While details of the events recited by the plaintiffs in the various school districts may vary, the essential elements of what transpired in each district are the same.

The teachers in each of the school districts are represented by the local education associations. Persons who are members of the local association are automatically members of the county education association, the New Jersey Education Association (NJEA), and the National Education Association (NEA). The dues which members of the local association pay include dues to the local, county, state and national associations. The record establishes that both NEA and NJEA spend substantial sums for national and state candidates for office and for lobbying at the national and state levels.

NJEA provides very extensive organizational support services to the local associations, and the uniformity in the forms and procedures which the local associations used in implementing the representation fee provisions of the Act are attributable to the fact that they were prepared or suggested by NJEA.

After the adoption of the representation fee amendment the various school boards and the local education associations negotiated and agreed upon representation fee provisions. These provisions required the withholding from salaries of nonassociation members and payment to the association of a sum equal to 85% of members' dues, initiation fees and assessments.

Upon negotiation of such a provision the local association sent letters to non-members inviting them to join the association and explaining that failure to join would result in imposition of the representation fee. The letters of the various local associations were of the same tenor. The one to plaintiff Meveril Jones read, in part:

> The climate in which we work today is not the best. Attacks on the public schools by the press, by politicians, and by school board associations require us to maintain a maximum effort to protect your rights and to advance your interests. We must spend ever increasing amounts of money to provide proper legal defense for members, to bargain effectively, to process grievances, to lobby for the protection of tenure, pensions, sick leave, and other benefits. In these crucial times we need your support.
>
> Under the terms of Public Law 1979, Chapter 477, the Westfield Education Association has negotiated a fair share representation fee to be deducted from the paychecks of all bargaining unit members who do not join the Association by October 15. This representation fee amounts to 85% of our dues or $179.35 to be collected in monthly installments over the

life of our contract with the Board of Education.

The dues on the basis of which the Westfield representation fee was computed amounted to $211 and were distributed as follows: $45 to NEA, $117 to NJEA, $12 to Union County Education Association, and $37 to Westfield Education Association.

Non-member teachers in the various school districts objected to the withholding of representation fees, communicating their objections both to the boards of education or superintendents and to the local associations. The grounds for the objections included unwillingness to make payments to state and national organizations espousing social and political causes with which the non-member disagreed and opposition to compulsory unionization as a matter of principle.

The various plaintiffs sought to utilize the demand and return systems established in their districts to challenge the 85% fees. Typical of the experiences of each of the plaintiffs are the experiences of John Russell and plaintiffs Richard H. Trexler, A. William Onder, Leon Matelski and Edward Jakubco, who joined with him to seek a refund of payments withheld and paid to the Edison Township Education Association.

In December, 1980 the Board of Education had agreed that by December 31st the Association would determine which teachers were to be assessed the representation fee, the Association would establish a demand and return system "through which non-members can challenge the amount of the representation fee" and the 1980–81 Agreement would contain a provision obligating the Teacher Association to indemnify and hold the board harmless for liability and costs of suit arising out of actions taken in conformity with the representation fee provisions.

By a letter dated December 30, 1980 Russell and the other non-members were invited to join the Association and were informed that the 85% fee would be deducted from the salaries of non-members. On February 25, 1981 Russell wrote to the President of the Edison Township Education Association. He protested the amount of the representation fee, particularly that part going to the county, state and national associations. He asked for copies of the 1980–81 budgets for the local, county, state and national teacher associations.

On April 8, 1981 the President of the Edison Township Education Association responded. She expressed disagreement with Russell's contention that portions of his representation fee could not be paid to the county, state and national associations. She informed him that at the end of the 1980–81 fiscal year he would be able to challenge the absence of a final rebate or the size of a rebate under the Association's demand and return system. He was informed that at that time "you will be provided with the appropriate information, including any budgets that may be relevant". His letter was treated as a request for a rebate and he was told it would be processed accordingly.

At some time prior to April, 1981, when Russell received the reply to his letter, the Edison Township Education Association had adopted a Demand and Return System (the System) prepared by NJEA for use by all local associations. The same System appears to have been adopted in the other school districts which are defendants in this case. It must be described in some detail.

The System defined the "fiscal year" as September 1 through the following August 31. It defined "member only benefits" as "benefits financed through the regular membership dues, fees and assessments available to or benefiting only members of the Association, but does *not* mean governance meetings which may be attended only by members and other member only activities and functions which are necessary for the operation and institutional maintenance of the Association *or the associations with which it is affiliated*". (Emphasis added.) Thus, no portion of the governance or institutional expenses were to be apportioned to political or lobbying activities in which any of the four levels of associations engaged. Evidently all such expenses were to be included in representation fees and to be

treated as if they were incurred only for contract negotiation and administration and grievance proceedings from which non-members benefited.

"Political activity" was also defined, and there was excluded (in line with the Act) "lobbying activities designated to foster policy goals in collective negotiations and contract administration or to secure for the employees represented by the Association advantages in wages, hours and other conditions of employment in addition to those secured through collective negotiations with the boards of education".

The System required that not more than 30 days after the beginning of each fiscal year in which a representation fee is in effect, the Association determine from the budgets of the four levels of associations the "preliminary rebate". The preliminary rebate was the amount by which expenditures for political activities and member only benefits exceeded the difference between membership dues and representation fees.

The System required that not more than 30 days after the end of each fiscal year the Association determine the "final rebate", making the same computation but using actual expenditures rather than budget allocations.

The System created a four-member Regional Review Panel consisting of representatives designated (one each) by the Edison Teachers Association, the Middlesex County Teachers Association, NJEA and NEA.

Section II of the System provided that not more than 60 days after the representation fee agreement becomes effective in any fiscal year the Association shall post a notice stating whether there is a preliminary rebate and the steps to be taken by a non-member to request it.

Section III states that a non-member may request a rebate by filing a statement with specified information not more than 30 days after he first paid any portion of the representation fee or knew or reasonably should have known of his right to request a rebate.

Section IV provides that upon receipt of the request the Association will place any preliminary rebate attributable to the claimant in escrow and advise the claimant that the final rebate to which he is entitled will be sent to him after the end of the fiscal year.

Section V of the System specifies that not more than 30 days after the end of the fiscal year the Association shall send to each non-member who requested a rebate a communication indicating whether there is a final rebate and the steps to be taken to challenge the absence or amount of a final rebate.

Section VI governs challenges to final rebates or to the absence of a rebate. A non-member must mail his challenge not more than 10 days after he received the notice of final rebate provided for in Section V. The Association must attempt to dispose of the challenge informally, but if that is not successful the claimant may refer the challenge to the Regional Review Panel. He must mail this challenge no later than 10 days after he sent his original challenge to the Association. The System provides, in accordance with the statute, that "the burden of demonstrating that no part of the unrebated representation fee was used for political activity or member only benefits shall be upon the Association". The Panel is required to render its decision not more than 30 days after the non-member sent his challenge to it. A non-member who is not satisfied with the decision of the Panel may appeal to the three-member board established under the Act.

Returning to Russell's challenge to the representation fee paid to the Edison Township Education Association, the April 8, 1981 letter which he received from the Association's President advised him, as noted above, that his February 25, 1981 letter would be treated as a request for rebate. The request was treated as being made under Section III of the System, that is to say, a challenge to the amount of the preliminary rebate. The next communication he received was a September 28, 1981 letter from the Association advising him as follows:

The Edison Township Education Association having computed its actual expenditures for the 1980–81 fiscal year, finds that it has expended $2.25 (of a total of $10.99 expended by all levels of the Unified Profession, including ETEA, MCEA, NJEA and NEA) per member for member-only benefits and partisan political and ideological activities. This amount is not in excess of the percentage allowable by law and is, therefore, not subject to a rebate.

Should you wish to challenge this decision, the attached instructions will provide you with the proper procedures.

The September 28th letter was in compliance with Section V of the System, i.e., notification of final rebate. On October 5, 1981 Russell wrote the Association challenging the absence of a final rebate for the 1980–81 school year. He again asked for copies of the final budgets for that year of the four education associations to which his representation fee was paid. He asked for an explanation of the line items.[5] Under Section VI of the System the Association was required to communicate with Russell to seek to dispose of the challenge informally. That was not done and, consequently, on October 15, 1981, the last day permitted under the System, Russell notified the Association that he wished to refer the challenge to the Regional Review Panel. He again asked for copies of the applicable budgets and an explanation of the line items.

On October 27, 1981 the President of the Edison Township Education Association advised Russell that she had forwarded his letter "to the appropriate office". On November 5th she advised Russell that the Regional Review Panel would hear his claim at 7:00 p. m. on November 17, 1981 (a date after the expiration of the 30 days

within which the Review Panel was required to render its decision). The hearing was held as scheduled.

By letter dated November 18, 1981 the Review Panel advised Russell that it had rejected his challenge and the challenges of Jakubco, Matelski, Onder and Trexler, stating, in part:

Pertinent budget material and testimony was presented by the following people for the respective organizations:

1. Aurora Bernard-Salit for the Edison Township Education Association

2. Maria Versocki for the Middlesex County Education Association

3. Cary Pitman for the New Jersey Education Association and National Education Association

The challengers argued that:

1. The composition of the panel was unfair.

2. The demand and return system was unlawful.

Following the hearing the Regional Review Panel gave full consideration to all of the documents, testimony and arguments presented to it and determined that the total dues required to be paid by each member of Edison Township Education Association for 1980–81 was $248.00 and the per capita cost for member only benefits and partisan political and ideological activities was $11.02 which is less than 15% of the total dues. The panel then concluded that no part of the representation fee required to be paid by non-members was used for member only benefits or partisan political or ideological activities. Therefore, there is no final rebate due of any portion of that representation fee.

---

5. The experience of the non-union plaintiffs in a case similar to this one instituted in Michigan, *Lehnert v. Ferris Faculty Association*, No. G78–346 CA 1 (W.D.Mich., filed May 22, 1978), raises a doubt whether NEA financial figures will ever be made available to Russell however often he asks for them. In that case NEA withdrew its claim against the non-union teachers for its share of the agency shop fees in controversy, citing the extreme burdensomeness of complying with financial discovery requests. If assembling such data imposes an intolerable burden on a wealthy and powerful national union, it requires little imagination to picture the burden imposed upon individual teachers seeking to determine if the fees withheld from their salaries have been properly computed.

Should you not be satisfied with the above decision of the Regional Review Panel, you may appeal to the Board established pursuant to the statute (34:13A–5.6).

It would have been a tour de force if, in one evening, the Regional Review Panel could have made the extraordinarily difficult financial analysis of the 1980–81 expenditures of the four education associations required to determine what portions should be attributable to political and member-only purposes. It heard the testimony of the three persons referred to in the decision letter quoted above, none of whom appear to have had any particular accounting expertise. Six very brief documents accompany the decision letter in the record and it seems likely that, with the exception of the first, they were submitted to the Review Panel: (1) The first document was a form evidently prepared by NJEA, designed to specify the dues payable to each of the four levels of education associations and the per capita portion of each portion of dues spent for member-only benefits and political activities. (2) The second document appears to be the 1980–81 expenditures of the Edison Township Education Association, totalling $87,140.34. (3) The third document sets forth the income and expenditures of the Middlesex County Education Association for the period May 1 to June 30, 1980, with the 1979–80 budget figures set forth. (4) The fourth document consists of handwritten notes and figures, the significance of which is not immediately apparent. (5) The fifth document is entitled "New Jersey Education Association Computation of 'Member Only Services' and 'Political Activity of Partisan Nature' for Period 9/1/80 to 8/31/81". It shows total expenditures of $12,227,000 by operating categories and shows six items totalling $267,771 as the net cost of member-only services, i.e., 2.19% of total expenditures. Thus, it is stated, of the $117 dues payment, only $2.56 is attributable to member-only benefits. The document further states that "All expenditures for partisan political activity which are incurred have been reimbursed by the NJEA PAC. A total of

$1,406 was reimbursed for the period covered." The document does not appear to disclose what was spent for lobbying either of the kind for which, under the Act, a representation fee may be charged or of the kind for which, under the Act, a representation fee may not be charged. (6) The final document is the NEA's "Political Activity Rebate Preliminary Estimate 1980–81". Its full significance cannot be understood from the face of the document, but it states that the amount expended for political activity was $3,561,922 out of total expenditures of $37,059,124, constituting 9.61% of the total. Various adjustments were made which resulted in a computation that political activity accounted for 10.28% of total expenditures, resulting in $4.63 of each member's dues of $45 going toward political activities. It cannot be ascertained from the document whether any lobbying expenses were included in political activities expenditures, and, if so, what kind of lobbying activities. It does not appear that any member-only expenses were taken into account. An affidavit filed in this case by Mitchell E. Roth, Esquire, a staff attorney in the Office of General Counsel of NEA, describes the procedures NEA follows to compute political activity rebates.

It is evident that if it is to be determined whether New Jersey's representation fee statute has been followed it would be necessary to ascertain the assumptions which were used in determining what items should be included in membership-only and political activity expenses, and it would be necessary for accountants to analyze the books and records of each of the four constituent education associations to determine if the computations had been properly made.

Having been unsuccessful before the Regional Review Panel, Russell and his fellow claimants tried to appeal to the statutory Appeals Board. They had considerable difficulty obtaining information as to the whereabouts of this Board. Nevertheless, on December 7, 1981, they addressed a letter to it in care of PERC, notifying it of their wish to appeal. On February 11, 1982

they received a letter from defendant James W. Mastriani, Chairman of PERC, advising that the Appeals Board had not been fully constituted nor had administrative rules been adopted to carry out its responsibilities under the Act. PERC did take one definitive action—it assigned the case a docket number.

No further action having been taken by the Appeals Board, Russell and the other plaintiffs filed their complaint in this Court on April 13, 1982.

There was considerable delay in establishing the Board of Appeals which, under N.J.S.A. 34:13A–5.6, was to consist of three members appointed by the Governor with the advice and consent of the Senate. Although the Act became effective July 1, 1980, it was not until December, 1981 that the Governor appointed the third member. The person named as Chairman resigned in February, 1982.[6]

However, by May 24, 1982 (after the instant cases had been filed in this Court), the Board had concluded that it would not hear the appeals itself and should refer them to the Office of Administrative Law, pursuant to New Jersey's Administrative Procedure Act. N.J.S.A. 52:14B–1, *et seq.* On that date the Board referred two appeals to the Office of Administrative Law for *de novo* hearing—the appeal filed by Russell, Jakubco, Matelski, Trexler and Onder, and an appeal filed by another plaintiff in this case, Thomas Gay. The persons who appealed to the Board must now anticipate lengthy proceedings of a judicial nature. *See Williams v. Red Bank Bd. of Ed.,* 662 F.2d 1008 (3d Cir. 1981). There will be a full evidentiary hearing before an administrative law judge, who will report his findings and recommendations to the Board of Appeals. The Board will then render a final decision. From that decision, the claimants (or the education associations) will have the right to appeal to the Appel-

late Division of the Superior Court of New Jersey, N.J.Ct. Rule 2:2–3(a), with the possibility of further review by the New Jersey Supreme Court, N.J.Ct. Rules 2:2–1, 2:12— all this to contest the amount of claimants' 1980–81 representation fee. Of course, if any claimant believes the defect in computing the fee extends to the 1981–82 fee, or the 1982–83 fee, the tortuous route beginning with an objection to the preliminary rebate pursuant to Section III of the local education association's Demand and Return System must be resumed for each year.

### Conclusions of Law

The Court has jurisdiction over these actions by virtue of 28 U.S.C. § 1343 to provide remedies for causes of action arising under 42 U.S.C. § 1983.

Plaintiffs seek preliminary injunctive relief. This is an equitable remedy and to prevail plaintiffs must show: (i) a reasonable probability of ultimate success on the merits of the litigation, (ii) irreparable harm to the plaintiffs if the injunction is not granted, (iii) the absence of countervailing harm to other interested persons if the injunction is granted, and (iv) the absence of countervailing public interests should the injunction be granted. *Kennecott Corp. v. Smith,* 637 F.2d 181 (3d Cir. 1981).

### A. *The Merits*

I turn first to the question whether plaintiffs have shown that they have a reasonable probability of success on the merits.

Two questions of constitutional law must be addressed. First, does the provision of N.J.S.A. 34:13A–5.5 c permitting labor organizations to use the representation fees of public employees for lobbying activities designed to foster policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those

---

**6.** Plaintiffs in a state court proceeding (not the plaintiffs in this case) sought to restrain collection of representation fees on the ground that the Board of Appeals had not been appointed as mandated by the statute. The trial court denied the requested relief holding that a Board

of Appeals had been duly constituted and could act even though one of its three members had resigned. *Olsen v. State of New Jersey.* Docket No. C–4286–81E (Super.Ct., Chan.Div. July 12, 1982). A notice of appeal has been filed.

secured through collective negotiations with the public employer violate the First Amendment rights of non-member employees. Second, do the statutory provisions providing for a demand and return system for the recovery of impermissible expenditures of representation fees overcome the substantive and procedural due process challenges to the New Jersey representation fee plan.

The resolution of these questions must start with the state of the law as developed in a trilogy of United States Supreme Court cases—*Railway Employees' Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *International Assoc. of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

The Court recognized an important governmental interest which is advanced by agency shop provisions.

> The confusion and conflict that could arise if rival teachers' unions, holding quite different views as to the proper class hours, class sizes, holidays, tenure provisions, and grievance procedures, each sought to obtain the employer's agreement, are no different in kind from the evils that the exclusivity rule in the Railway Labor Act was designed to avoid.... The desirability of labor peace is no less important in the public sector, nor is the risk of "free riders" any smaller.

*Abood* at 224, 97 S.Ct. at 1793.

■ The existence of the important government interests advanced by the agency shop arrangement supports the impingement upon associational freedom which an agency shop entails. In *Abood* the Court dealt with a challenge to a collective bargaining agreement provision which required every teacher who had not become a union member within 60 days of hire (or within 60 days of the effective date of the provision) to pay the union a service charge equal to the regular dues required of union members. The Court observed that "insofar as the service charge is used to finance expenditures by the Union for the purposes of collective bargaining, contract administration and grievance adjustment, [the *Hanson* and *Street* decisions] appear to require validation of the agency shop agreement before us", *id.* pp. 225, 226, 97 S.Ct. pp. 1794, 1795.

■ Under the principles of *Hanson, Street* and *Abood,* New Jersey has the unquestioned power to enact legislation permitting collective bargaining agreements to require that public employees in a bargaining unit who are not members of the bargaining representative pay a service fee for the benefits they receive from the bargaining representative.

In *Abood,* however, the Court was confronted with a statute which sanctioned the use of non-union-member fees for purposes other than collective bargaining, including legislative lobbying and support of political candidates. Plaintiffs in that case argued that such use of service fees paid by them was a violation of their constitutional rights. The Court agreed:

> The fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights. For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State ...
>
> These principles prohibit a State from compelling any individual to affirm his belief in God ... or to associate with a political party ... as a condition of retaining public employment. They are no less applicable to the case at bar, and they thus prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public teacher.
>
> We do not hold that a union cannot constitutionally spend funds for the expression of political views, in behalf of political candidates, or toward the ad-

vancement of other ideological causes not germane to its duties as collective bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of government employment.

*Id.* at 234–236, 97 S.Ct. at 1799–1800.

In a footnote, the Court dealt with the contention that non-members could not be required to pay for social activities not open to non-members, stating, "It is unclear to what extent such activities fall outside the Union's duties as exclusive representative or involve constitutionally protected rights of association. Without greater specificity in the description of such activities and the benefit of adversary argument, we leave those questions in the first instance to the Michigan courts." *Id.,* n.33 p. 236, 97 S.Ct. n.33 p. 1800. That question, of course, is not implicated in this case because the New Jersey statute excludes from the representation fee the cost of benefits available to or benefitting only its members. N.J.S.A. 34:13A–5.5.

■ However, New Jersey's statute does require that I address the "difficult problems in drawing lines between collective bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited." While permitting a non-member to demand the return of any part of a fee paid by him which was used either in aid of activities or causes of a partisan political nature only incidentally related to the terms and conditions of employment or for member-only benefits, the statute specifically excludes from the refund "the costs of support of lobbying activities designed to foster policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours and other conditions of employment in addition to those secured through collective negotiations with the employer".

Defendants argue that non-members should pay for this kind of lobbying, since it is designed to secure for them, as well as for members, increased benefits and improved conditions of employment. Plaintiffs argue that this kind of lobbying extends far beyond what *Abood* held to be permissible and permits their representation fees to be used for ideological and political purposes.

The *Abood* opinion, while not deciding, suggests how the line between permissible and impermissible lobbying expenditures from representation fees should be drawn. Repeatedly the Court stated that it is permissible to require non-members to contribute to the cost of collective bargaining activities. The example of permissible use of non-member representation fees for lobbying purposes involved a direct relationship to on-going collective bargaining: "The process of establishing a written collective bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; *related* budgetary and appropriation decisions might be seen as an integral part of the bargaining process." *Id.* at 236, 97 S.Ct. at 1800. Thus, this example contemplated a situation in which negotiations have led to agreement, but implementation requires legislative or administrative action by a public body. Expenses incurred to secure such action, it would appear, may properly be made from representation fees.

The New Jersey statute permits much more extensive use of representation fees for lobbying purposes—"lobbying activities designed to foster policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment *in addition to those secured through collective negotiations with the public employer*". N.J.S.A. 34:13A–5.5 c (emphasis added). This, I conclude, goes beyond the permissible limits and has the effect of compelling non-members to support ideological causes with which they disagree.

The example which defendants themselves have advanced illustrates the point. There are a number of subjects which, under New Jersey law, are not the subject of negotiation in the collective bargaining process. For instance, a majority representative of public employees cannot negotiate contractual clauses prohibiting the loss of jobs through reduction in force or subcontracting. *In re Local 195, IFPTE v. State of New Jersey,* 88 N.J. 393, 443 A.2d 187 (1982); *In re Maywood Board of Education,* 168 N.J.Super. 45, 401 A.2d 711 (App. Div.1979), *certif. den.,* 81 N.J. 292, 405 A.2d 836 (1979); *Union Cty. Bd. of Ed. v. Union Cty. Teach. Assn.,* 145 N.J.Super. 435, 368 A.2d 364 (App.Div.1976), *certif. den.,* 74 N.J. 248, 377 A.2d 654 (1977). Other terms and conditions of employment—such as pension plans or seniority as it relates to layoff, recall, "bumping" and reemployment of Civil Service employees—are set by statute or regulation which preempt collective negotiations. *State v. State Supervisory Employees Association,* 78 N.J. 54, 393 A.2d 233 (1978). Defendants contend that they may constitutionally use non-member representation fees to lobby to change these statutes.

There are very deep political and ideological differences of opinion as to the merits of these statutes. On the one hand there are those who believe that these subjects which are not now the subject of collective bargaining should be left completely in the hands of school boards and legislators who are elected by and responsible to the voters.[7] These bodies should exercise their judgment in these areas, so the argument goes, without being subjected to the pressures brought to bear by employee organizations. The contrary view, espoused most strongly by employee organizations such as those which are defendants in this case, is that these subjects should be opened up to the bargaining process or dealt with directly by legislation.

Although plaintiffs are teachers and defendants can argue that they might benefit personally from changes in these laws, plaintiffs and other non-members of the employee organizations may nevertheless oppose such legislative changes. They may oppose for political or ideological reasons; they may believe, as do many other citizens, that the legislative changes sought by the employee organizations are bad public policy even though they, as teachers, might receive certain benefits.

I do not believe *Abood* permits a state to compel a non-member to support lobbying of this nature through use of her representation fee. New Jersey's statute does permit such lobbying, and to that extent it violates plaintiffs' First Amendment rights.

The next question going to the merits which must be addressed is whether, even assuming the validity of the statute's lobbying provisions, the demand and return system adequately protects plaintiffs' First Amendment rights.

As described above, the New Jersey statute specifies that the representation fee "shall be in an amount equivalent to the regular membership dues, initiation fees and assessments charged by the majority representative to its own members less the cost of benefits financed through the dues, fees and assessments and available to or benefitting only its members, but in no event shall such fee exceed 85% of the regular membership dues, fees and assessments". N.J.S.A. 34:13A–5.5 b. The representation fee, therefore, may be spent for political, ideological and lobbying activities, but the statute gives a payor of the fee a right to demand and receive back his pro rata share of expenditures for political and ideological purposes and, as described above, for some lobbying purposes. This system purports to find support in *Abood.*

An examination of *Abood,* however, suggests that such support is tenuous at best. There the Court addressed the question of an appropriate remedy if the plaintiffs

---

7. Some school boards are appointed by elected officials rather than being elected directly, but the argument as to responsibility to the voters to make decisions in critical areas uninfluenced by the pressures of labor negotiations remains the same.

proved their allegations that their payments to the union had been used for political or ideological purposes. It noted with approval the remedies suggested in *Street* and in *Railway Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), namely, an injunction against expenditures for political causes of the moneys paid by objecting non-member employees and restitution of an appropriate fraction of the sums paid representing expenditures for political purposes.

In *Abood,* after the commencement of litigation, the union had adopted a plan whereby a dissenting employee who filed a protest against political expenditures was entitled to a pro rata refund of his service charge in accordance with the calculation of the portion of total union expenses for the specified purposes. The calculation was made by the union in the first instance, but was subject to review by an impartial board. In view of that development the Supreme Court, upon remanding the case, suggested that "[i]n view of the newly adopted Union internal remedy, it may be appropriate under Michigan law, even if not strictly required by any doctrine of exhaustion of remedies, to defer further judicial proceedings pending the voluntary utilization by the parties of that internal remedy as a possible means of settling the dispute". *Id.,* 431 U.S. at 242, 97 S.Ct. at 1803. In a footnote the Court stated, "We express no view as to the constitutional sufficiency of the internal remedy described by the appellees. If the appellants initially resort to that remedy and ultimately conclude that it is constitutionally deficient in some respect, they would of course be entitled to judicial consideration of the adequacy of the remedy." *Id.,* n.45, p. 242, 97 S.Ct. n.45, p. 1803. This is hardly an endorsement of the constitutionality of a demand and return system.

Justice Stevens' concurring opinion confirms that *Abood* left open the question of the constitutionality of any demand and return system:

By joining the opinion of the Court, including its discussion of possible remedies, I do not imply—nor do I understand the Court to imply—that the remedies described in *Machinists v. Street,* 367 U.S. 740 [81 S.Ct. 1784, 6 L.Ed.2d 1141], and *Railway Clerks v. Allen,* 373 U.S. 113 [83 S.Ct. 1158, 10 L.Ed.2d 235], would necessarily be adequate in this case or in any other case. More specifically, the Court's opinion does not foreclose the argument that the Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining. Any final decision on the appropriate remedy must await the full development of the facts at trial *Id.* at 244, 97 S.Ct. at 1804.

In a recent decision the Court of Appeals for the Ninth Circuit relied upon *Abood* for the proposition that "The rebate remedy formulated to avoid statutory violations was thus approved to protect against constitutional violations as well." *Ellis v. Brotherhood of Railway and Airline and Steamship Clerks,* 685 F.2d 1065, 1070 (9th Cir. 1982). Relying upon that proposition the Court sustained the district court's finding that the union's rebate plan protected from constitutional attack the Brotherhood's union shop agreement and the resulting use of dues of dissenting members for political and ideological purposes. In light of footnote 45 in *Abood*'s majority opinion and in light of Justice Stevens' comments in his concurring opinion, it appears to me that the major premise for the Ninth Circuit's conclusion is flawed.

I set forth in some detail in the findings of fact in this case the efforts which various of the plaintiffs expended in an attempt to pursue the demand and return system contemplated by the New Jersey statute. Were it not apparent from the face of the statute, it certainly becomes apparent when one reviews these facts that the demand and return system created by N.J.S.A. 34:13A–5.6 imposes heavy burdens on a non-member who pays a representation fee to a multi-tiered union. Even though the burden of proof is on the union, that initial

burden can be readily met, as it was in the case of the AAUP and education association proceedings in this case. In each case very simple and conclusory statements as to expenditures were submitted by each union tier—two tiers in the case of AAUP, four tiers in the case of the education associations. Confronted with such a showing, the non-members must then go behind those statements to test not only the propriety of the accounting involved but also the assumptions which were made in allocating expenses to member-only benefits, partisan political activities, and varying kinds of lobbying activities. This the non-members must do before the internal union bodies and then before an administrative law judge. They must proceed before the Appeal Board after the administrative law judge makes his findings and recommendations and they are confronted with an appeal to the Appellate Division of the Superior Court of New Jersey and possibly to the New Jersey Supreme Court.

This system does not prevent "compulsory subsidization of ideological activity by employees who object thereto", *Abood,* 431 U.S. at 237, 97 S.Ct. at 1800. Unless a public interest law firm represents the non-members as in the present cases, a non-member could not be expected to expend the time and money required to recover that portion of his representation fee used for political or ideological purposes. *See Railway Clerks v. Allen, supra,* 373 U.S. at 118, 83 S.Ct. at 1161.

The defendants urge that limiting the representation fee to 85% of a member's dues and assessments is a practical guarantee that a non-member's fees will not be used for improper purposes. There might be some merit in this contention if only expenses of the local bargaining representative were involved and if, in advance of the collection of the representation fee, there was available a detailed budget showing receipts and expenditures of the local organization. That is not the case here, however. In the AAUP situation there is a tri-partite local association covering the Camden, New Brunswick and Newark campuses and over it there is a very large national organization with headquarters in Washington, D.C. In the education association situation there are relatively modest local and county associations functioning under the umbrella of large and powerful state and national organizations. To assume that membership-only expenses and political, ideological and lobbying expenses of each of those organizations total 15% or less of pertinent total expenses requires an exercise of faith which should not be required of plaintiffs.

The fault inherent in the New Jersey statutory system is that it shifts the burden to the wrong party and in so doing, as a practical matter, it either permits non-consensual expenditures for political and ideological purposes or else it creates a situation where it cannot be ascertained without intolerable efforts whether such expenditures have been made.

I do not believe anything in *Abood* permits this result. One highly respected state court has so held. *School Committee of Greenfield v. Greenfield Education Association,* 385 Mass. 70, 431 N.E.2d 180 (Sup.Jud. Ct.1982).

In *Greenfield* the Court dealt with a rebate procedure established under a statutorily authorized collective bargaining agreement which required teachers who were not Association members to pay an agency service fee to the Association commensurate with the cost of collective bargaining and contract administration as determined by the Association. The service fee for the year in question was $153; dues in that year were $158. There was no dispute that a portion of the $153 was used for social, political and speech activities of the Association. The School Committee instituted suit against the Education Association and two teachers who refused to pay the service fee, seeking a declaratory judgment as to whether it could dismiss the teachers without violating the statutory and constitutional rights of the teachers.

The Massachusetts statute authorizing the payment of a service fee as a condition of employment required that the employee

organization receiving the fee establish "a procedure by which any employee so demanding may obtain a rebate" of the portion of the fee which involves expenditures by the "organization or its affiliates" of moneys for political, social, or charitable purposes. Mass.General Laws c. 150E, § 12, as amended by St.1977, c. 903. The Association urged that the rebate procedure met the requirements of *Abood.* The teachers argued that the rebate procedure infringed on their rights in two ways: "first, it would deny them due process of law if the initial decision on fee allowability is made by the association, which has an obvious stake in the controversy; and second, it would violate their First Amendment rights if they must first pay the entire amount to the association, allowing it to use the funds in the interim for social, political, and speech activities, and depriving them of the use of the funds for their own expressive activities". *Id.,* 431 N.E.2d at 186.

The Court described the rebate procedures available to the teachers in that case. The procedures were similar to the procedures required by the education associations in the present case, although in *Greenfield* there were three instead of four tiers of education associations. The Court concluded that "[t]he procedures appear not only cumbersome but designed to discourage all but the most zealous employee". *Id.,* 431 N.E.2d at 186 n.4. The Massachusetts statute did not create an Appeal Board to which an employee could appeal an adverse determination of the Association. Such an appeal introduces impartiality into the proceedings and adds to their cumbersomeness.

In *Greenfield* the Court held that:

Mandating resort to the rebate procedure here would produce a further constitutional difficulty because of the requirement that the entire fee be paid to the association pending proof of legitimacy. This interim payment, as the teachers contend, not only deprives them of the opportunity to engage in expressive activities with those funds but also forces them to subsidize the objectionable activities of the organization. Justice Stevens wrote a concurring opinion in *Abood* primarily to warn against any implication that employees could be forced to subsidize, even temporarily, activities they found objectionable. *Abood, supra* [431 U.S.] at 244 [97 S.Ct. at 1804]. We agree: the teachers should not be required to suffer an interim *constitutional* deprivation, while the association is deprived only of funds to which it is entitled by statute and agreement.

We find unpersuasive those cases which uphold a requirement that the fee be paid to the organization pending a determination, judicial or otherwise, of the permissible amount. See *White Cloud Educ. Ass'n v. White Cloud Bd. of Educ.,* 101 Mich.App. 309 [300 N.W.2d 551] (1980); *Browne v. Milwaukee Bd. of School Directors,* 83 Wis.2d 316, 335–340 [267 N.W.2d 379] (1978).

*Id.,* 431 N.E.2d at 189.

The Court further held that as a matter of statutory interpretation the Massachusetts statute gave the dissenting employee the option of using the rebate procedure or bringing a complaint before the Labor Relations Commission:

We conclude that § 12 does not require dissenting employees to pay the disputed fee to the association, pending adjudication. . . . The [Labor Relations] Commission may require the employee to pay the disputed fee into an escrow account, but may not require that it be paid to the organization until the Commission has determined the permissible fee. Once the employee has brought a complaint, the burden of justifying the fee as permissible must rest on the organization.

*Id.,* 431 N.E.2d at 189.

The facts in the *Greenfield* case differ from the case at hand in two important respects. First, in Massachusetts there was no provision for the employer to withhold from the teacher's salary the representation or service fee as there is in New Jersey. Thus the New Jersey teacher does not have the option available to the Massachusetts teacher of preventing use of his money for impermissible purposes by not paying the

fee. Second, under the New Jersey statute there does not appear to be any alternative to the cumbersome statutory rebate procedure. These differences make it even more difficult to square the New Jersey statute with the United States Constitution.

■ I am of the opinion that *Greenfield* was a reasoned and correct application of *Abood* to a situation having significant similarities to the present case. Applying *Abood* and the same reasoning to the present case requires a holding that N.J. S.A. 34:13A–5.5 and 5.6 violate plaintiffs' constitutional rights in that (i) these statutory provisions permit labor organizations to receive and use plaintiffs' representation fees for political, ideological and impermissible lobbying purposes over plaintiffs' objections, and (ii) the demand and return system purportedly designed to enable plaintiffs to recover the portion of their representation fees used for political, ideological and impermissible lobbying purposes does not avoid or cure the improper use of representation fees because it is extraordinarily cumbersome and places heavy burdens upon a claimant.

In *Opinion of the Justices,* 401 A.2d 135 (Sup.Jud.Ct.Me.1979), the Court rendered an advisory opinion that an agency fee of 80% of union dues would be valid absent a prior evidentiary hearing, although the fact that such a fee was fixed by a collective bargaining agreement would not make the amount conclusive upon a non-member who puts the amount in issue in an appropriate judicial proceeding. I am not at all sure that, faced with the facts of the present case and not an abstract question, the Justices of the Supreme Judicial Court of Maine would uphold the validity of the representation fee set without prior evidentiary hearing in this case.

The demand and return system in the present case differs significantly from the refund system which was upheld in *Ky. Educators, Etc. v. Ky. Registry, Etc.,* 677 F.2d 1125 (6th Cir. 1982). There a teacher not only had the right to claim a refund of dues and political contributions deducted from his salary; he had the right to prevent deductions for political purposes by notifying the school district. The demand and return system in the present case more closely resembles the plan which was disapproved in *Federal Election Commission v. National Education Association,* 457 F.Supp. 1102 (D.D.C.1978). There the check-off system for political funds was held to violate the Federal Election Campaign Act of 1971 because it required any member who did not wish to contribute to submit a separate written request for refund and did not enable such member to prevent the deduction. The Court held that the system placed an undue burden on the dissenter—a very mild burden in comparison with the dissenter's burden in the present case. *Cf. Arrow v. Dow,* 544 F.Supp. 458 (D.N.M.1982) (use of dues of integrated bar for lobbying purposes).

The recent opinion of the Court of Appeals for the Third Circuit in *Galda v. Bloustein,* 686 F.2d 159 (1982), is instructive. The plaintiffs in *Galda,* Rutgers students, filed suit alleging that their First and Fourteenth Amendment rights had been violated by the University's requirement that they pay a refundable fee to support the New Jersey Public Interest Research Group (PIRG), an organization which engaged in political and ideological activities with which plaintiffs disagreed. The district court granted summary judgment upholding the PIRG funding arrangement because it contained a refunding mechanism. *Galda v. Bloustein,* 516 F.Supp. 1142 (D.N.J.1981). The refunding arrangement was the ultimate in simplicity. All a student was required to do was to submit a "Refund Request" form to PIRG. PIRG then ascertained that the claimant was a Rutgers student and had paid the fee. It issued a check directly to the student. The entire process from request to refund took only several months.

The Court of Appeals reversed, holding that if, in fact, the exaction of the fee was unconstitutional the refund provision would not be adequate to cure the defect. The case was remanded to the district court for a ruling on the constitutionality of the man-

datory fee. That, in turn, hinged upon the controverted issue whether there was a compelling state interest justifying this impingement upon plaintiffs' constitutional rights.

The Court referred to the *Abood* case and noted that "[w]e need not decide today whether, in a situation identical to that in *Abood,* a refund mechanism would be sufficient to cure an otherwise unconstitutional fee assessment". at 168. However, observations of the Court suggest that it would not approve the refund system established in N.J.S.A. 34:13A–5.6.

The Court pointed out that in *Abood* the Supreme Court found that there was a compelling state interest in labor peace, fostered by the collective bargaining process, and that this interest "was deemed sufficiently compelling to justify some intrusion on the employees' rights to associate". at 164. This justified compulsory fees to pay for collective bargaining, contract administration and grievance adjustment. The Court went on to observe that "[e]xtraneous activity in the political sphere, however, could not be so justified; thus, any political expenditures 'not germane to [the union's] duties as collective bargaining representative' could not be financed from fees paid by those who affirmatively objected to the union's ideological viewpoint. 431 U.S. at 235 [97 S.Ct. at 1799]" at 164.

■ The present case differs from *Galda* in at least one significant respect. In *Galda* it was conceded that the student fee at issue was used for political and ideological purposes. In the present case, at least some portion of the fees paid by plaintiffs are used for lawful purposes—to pay the non-members' share of collective bargaining, contract administration and grievance expenditures. Each union tier makes member-only expenditures and each makes political, ideological and lobbying expenditures. Plaintiffs are asked to accept on little more than faith that these expenditures at each tier do not exceed 15% of total expenditures and that, therefore, no portion of the representation fee (which is limited to 85% of union dues and assessments) is used by any

level of the unions for impermissible purposes. The unions are not required to make any advance showing that the fees are in an amount required for permissible purposes, and the reality of the situation is such that non-members do not have a viable procedure to determine after the fact whether their fees were used only for permissible purposes. This, I think, creates an insupportable situation.

To take a non-member's involuntary fee under circumstances where the non-member does not know in advance of payment and is unable to ascertain after payment whether the fee is used for political and ideological purposes which he opposes cannot be squared with the First Amendment.

As described above, the demand and return system created by the New Jersey statute places such heavy burdens on the objecting non-member and takes such an inordinately long time to complete, that in reality it does not constitute a system by which a non-member can recover that portion of the fees paid by him which is used for impermissible purposes. This burdensome demand and return system is in marked contrast to the very simple and effective system which in *Galda* the Court found inadequate to protect constitutional rights.

■ When confronted with the realities of union financing in this case, particularly in view of the fact that we are dealing with multiple tiers of unions, it becomes apparent that a demand and return system cannot protect a non-member's First Amendment rights. Those rights can be protected only if there is an advance determination of the amount to which the unions are entitled for collective bargaining services and only if the enforced payments are limited to those amounts.

From the conclusions set forth above, it follows that plaintiffs are likely to prevail on the merits.

### B. *Other Equitable Considerations*

It becomes necessary to determine whether plaintiffs have established the other elements which are a prerequisite to granting a preliminary injunction.

■ Plaintiffs are suffering and, unless relief is granted, will continue to suffer deprivations of their First Amendment rights. The statute in question permits unions to collect fees and use them for certain impermissible lobbying expenses with no right in non-members to obtain a refund of their fees used for those purposes. Further, the statute permits the unions to use the involuntary fees of non-members for political and ideological purposes with a right to demand a refund through proceedings so onerous that they are unusable. The fact that each plaintiff's monetary stake is small does not render the deprivation of a constitutional right less important. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadack v. Family Fin. Corp. of Bay View*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

The education association defendants and the AAUP defendants have no legitimate interest in receiving funds for purposes other than collective bargaining, contract administration and grievance processing.

The public and the education association and AAUP defendants have an interest in protecting the integrity and continued functioning of the collective bargaining process. To the extent that this depends upon payment of a fair share by non-members, they have an interest in the continued payment of the portion of the representation fees applicable to that process.

The public has an interest in insuring that public employees are not deprived of their First Amendment rights.

Balancing these interests precludes an immediate blanket injunction forbidding the collection of all representation fees until procedures meeting constitutional standards are adopted. *International Ass'n of Machinists v. Street*, 367 U.S. 740, 775, 81 S.Ct. 1784, 1803, 6 L.Ed.2d 1141 (1961). However, further balancing these interests requires that plaintiffs be accorded certain preliminary injunctive relief which will minimize the injury inflicted upon them pending a final hearing and until a valid representation fee system can be established.

## C. *Preliminary Relief*

The first constitutional defect in the New Jersey statute is the permission it gives to representatives of public employees to use non-member fees over the non-member's objections for lobbying purposes over and beyond lobbying designed to secure agency or legislative action required to implement a collective bargaining agreement. The AAUP defendants and the education association defendants will be preliminarily enjoined from using any portion of plaintiffs' representation fees for lobbying other than lobbying to secure such action. Further, those defendants will be ordered to include in any computations which they make of amounts refundable to plaintiffs any portion of plaintiffs' representation fees used for impermissible lobbying authorized by the New Jersey statute.

The second constitutional defect of the New Jersey statute rests in its permitting public employee unions to use representation fees for political and lobbying purposes and its attempt to cure this deprivation by providing a demand and return system which is unduly burdensome. An examination of the rather voluminous factual record in this case suggests that ultimately the only cure for this unconstitutional deprivation of constitutional rights will be to shift the burden of establishing a proper representation fee from the individual non-members (where in effect the burden now lies) to the AAUP and education association defendants who receive the payments and have readily available to them both the financial resources and the accounting data required to do this work. The more one examines the facts and the realities of the situation the more one becomes convinced that the potential for serious constitutional deprivations will exist unless the organizations receiving the fees are required to establish in advance of payment the amount required to reimburse them for services rendered for collective bargaining, contract administration and processing grievances. The burden must be on them to establish this amount with detailed financial and other appropriate data which satisfies some

impartial body capable of analyzing the data.

To enjoin payment of all representation fees until some such system is established might injure the collective bargaining process. To avoid that result such an injunction will not be issued at this time. An order will be entered, however, requiring that the portions of the representation fees paid by plaintiffs going to National AAUP and to the New Jersey Education Association and the National Education Association shall be placed in escrow with a third party and held until further order of the Court. These state and national organizations are less directly involved in the collective bargaining process and will, in any event, be unlikely to feel any substantial impact as a result of their inability to use their portions of plaintiffs' fees. The Rutgers Council of AAUP and the local and county educator associations are more directly involved in the collective bargaining process and may require their portions of the representation fees in order to perform their important functions. The record suggests that they are much less likely to engage in extensive political and lobbying activities than the state and national organizations and, therefore, it is less likely that the moneys they receive from plaintiffs will be used for those purposes. They will not be prohibited at this time from receiving their portions of plaintiffs' fees.

I appreciate that the loss of plaintiffs' representation fees will not critically affect the operations of any of the tiers of the organizations involved in this case, but in shaping the order to be entered I take into account the possibility that other non-members may seek similar relief.

The order will also provide that if a final hearing has not been held within six months, and if within that time there has not been established a representation fee system meeting constitutional requirements, plaintiffs may apply for additional injunctive relief.

Plaintiffs' attorneys are requested to submit to me and circulate among the other parties a proposed form or forms of order implementing this opinion on or before October 4, 1982. If there is disagreement as to the form, a hearing will be held at 2:00 p. m. on October 18, 1982 to settle the form of order.