Allen OLSEN, et al., Plaintiffs,

v.

COMMUNICATIONS WORKERS OF AMERICA (CWA), et al., Defendants.

Civ. A. No. 82–3443.

United States District Court, D. New Jersey.

March 16, 1983.

Henry A. Stein, Jeffry A. Mintz, Stein & Shapiro, Medford, N.J., and Nelson Kieff, National Right to Work Legal Defense Foundation, Inc., Springfield, Va., for plaintiffs.

Irwin I. Kimmelman, Atty. Gen. of N.J. by Alfred E. Ramey, Jr., Deputy Atty. Gen., Trenton, N.J., for defendant, Thomas H. Kean, Governor, State of N.J.

Steven P. Weissman, CWA District 1, Trenton, N.J., James B. Coppess, Adair & Goldthwaite, P.C., Michael T. Leibig, Zwerdling, Schlossberg, Leibig & Kahn, Washington, D.C., Sidney Reitman, Reitman, Parsonnet, Maisel & Duggan, Newark, N.J., for Communications Workers of America, AFL–CIO, CWA District 1, and Locals 1031, 1032, 1033, 1034, 1037, 1038, 1039, and 1040; Laurence Gold, AFL–CIO, Washington, D.C., of counsel.

## OPINION

DEBEVOISE, District Judge.

Plaintiffs, employees of the State of New Jersey who are not members of the union which is the majority representative of their employment unit, instituted this action attacking the validity of N.J.S.A. 34:13A–5.5 and 5.6. These statutory provi-

sions permit a public employer and a majority representative to include in a collective bargaining agreement provisions requiring non-members to pay a representation fee to the union. Plaintiffs also assert that they have been deprived of First Amendment rights to oppose implementation of the statute and to seek to persuade other State employees to join them in their opposition.

Defendants are Communications Workers of America, AFL–CIO ("CWA") (the majority representative), CWA District 1, CWA Locals 1031, 1032, 1033, 1034, 1037, 1038, 1039 and 1040, the State of New Jersey and Thomas H. Kean, Governor of the State of New Jersey.

In their complaint, plaintiffs seek to be designated representatives of a class pursuant to Fed.R.Civ.P. 23(b)(2) and (b)(3). The class is asserted to consist "of all public employees represented by CWA's locals, but who exercised their right not to be a member of defendant union and, therefore, have paid, and are paying, a representation fee pursuant to [N.J.S.A. 34:13A–5.5 and 5.6]." Plaintiffs seek injunctive and declaratory relief, nominal and punitive damages, and attorneys fees and expenses of suit.

On December 6 and 7, 1982, a hearing was held on plaintiffs' application for preliminary injunctive relief. Decision was reserved. Thereafter, plaintiffs' motion for class certification was denied for the reason that the positions and interests of non-members of the union are likely to be diverse and for the reason that the principal objective of a class action can be realized by treating this as a test case. This opinion constitutes my findings of fact and conclusions of law upon the preliminary injunction application.

## FINDINGS OF FACT

A. *The Statute:* The statutory provisions which are applicable in this case are described in the opinion in *Robinson v. State of N.J.,* 547 F.Supp. 1297, 1299–1301 (D.N.J.1982).

B. *The Majority Representative:* CWA is a national labor organization which has established Districts as geographic subdivisions. The Districts are staffed and financed as divisions of the national union and are not independent organizations.

The national union charters local unions which are separate organizations, electing their own officers and setting their own budgets. Under the CWA constitution, collective bargaining within the established bargaining units must be conducted under the direction of the CWA Executive Board, and all contracts and agreements entered into must be in the name of the national union.

In March 1981, CWA was certified as the majority representative for a State-wide unit of Administrative and Clerical State Employees. In August 1981, CWA was certified as the majority representative for three additional State-wide bargaining units consisting of Professional Employees, Primary Level Supervisors and Higher Level Supervisors, Eight State Locals were chartered by CWA for the purpose of representing employees in the four bargaining units—Locals 1031, 1032, 1033, 1034, 1037, 1038, 1039 and 1040. The Locals are not the certified bargaining representatives. Rather, as mentioned above, the CWA national union is the collective bargaining representative and signs all collective bargaining agreements.

Plaintiff Anderson is employed within Local 1032's jurisdiction (Department of Transportation and New Jersey Public Broadcasting Authority). Plaintiff Lang is employed within Local 1034's jurisdiction (Departments of Environmental Protection, Health, and Labor and Industry employed in Mercer County). Plaintiffs Olsen, Smartt and Harrington are employed within Local 1039's jurisdiction (Departments of Human Services, Corrections and Parole and Community Affairs employed in designated counties). Plaintiff Yull is not an employee in a CWA bargaining unit and, unlike the other plaintiffs, has not paid representation fees.

CWA and the State of New Jersey entered into negotiations and in October 1981 the negotiations resulted in four two-year

collective bargaining agreements (one for each bargaining unit), retroactive to July 1, 1981.

Article II, Section B(2) of each contract provides for the deduction of a representation fee in lieu of dues from the regular paychecks of non-union members in the respective units. Deductions commenced on or about July 12, 1982. The amount of the deduction is determined as follows:

    b.  Amount of Fee

Prior to the beginning of each contract year, the Union will notify the State in writing of the amount of regular membership dues, initiation fees and assessments charged by the Union to its own members for that contract year, and the amount of the representation fee for that contract year. Any changes in the representation fee structure during the contract year shall be in accordance with B.1.d. above.

The representation fee in lieu of dues shall be in an amount equivalent to the regular membership dues, initiation fees and assessments charged by the majority representative to its own members less the cost of benefits financed through the dues, fees and assessments and available to or benefiting only its members, but in no event shall such fee exceed 85% of the regular membership dues, fees and assessments.

CWA member dues were set at an amount equal to two hours pay. Dues and representation fees are forwarded directly to national CWA. National CWA retains 40% of the funds; it places 50 cents for each employee into a CWA Defense Fund; and it remits the balance of almost 60% to the locals. It will be noted that (subject to the 85% limitation) the representation fee is to be an amount equal to regular member dues, initiation fees and assessments less the cost of member only benefits but *not* less the amounts spent for activities of a partisan or political or ideological nature. This, of course, is consistent with the New Jersey statutory provision permitting representation fees.

Article II, Section B(2) of each contract also provides for the creation of a Demand and Return System:

    d.  Demand and Return System

The representation fee in lieu of dues only shall be available to the Union if the procedures hereafter are maintained by the Union.

The burden of proof under this system is on the Union.

The Union shall return any part of the representation fee paid by the employee which represents the employee's additional pro rata share of expenditures by the Union that is either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment, or applied toward the cost of other benefits available only to members of the majority representative.

The employee shall be entitled to a review of the amount of the representation fee by requesting the Union to substantiate the amount charged for the representation fee. This review shall be accorded in conformance with the internal steps and procedures established by the Union.

The Union shall submit a copy of the Union review system to the Office of Employee Relations. The deduction of the representation fee shall be available only if the Union establishes and maintains this review system.

If the employee is dissatisfied with the Union's decision, he may appeal to a three-member board established by the Governor.

C. *Details of the Demand and Return System:* In contrast to the Demand and Return System described in *Robinson v. State of N.J., supra,* CWA has established a highly sophisticated method for determining what expenditures are reimbursable, what expenditures are not reimbursable and how to apportion expenditures which are for both reimbursable and non-reimbursable items.

Under the New Jersey CWA Demand and Return System, an employee seeking reim-

bursement must submit a request in writing to CWA's secretary-treasurer in Washington, D.C. Upon receipt of the request, 40 percent of the payments received from the objecting fee payer is placed in an escrow account to be held until a rebate is paid to the objector and any dispute concerning the amount of the rebate has been resolved. The account bears interest at 5.25% annually and rebates to objectors include interest at this rate for the period their money is held. For the fiscal year ended September 30, 1982, CWA received more than 2000 rebate requests from workers employed by the State of New Jersey and represented by CWA.

The CWA Executive Committee determines the amount of the union's rebatable activities for the year on the basis of the calculation described below and on the basis of data which the CWA locals representing New Jersey State employees forward to the Executive Committee. The Executive Committee is required to make its determination by the January 1 following the close of the fiscal year.

Along with any rebate payment, an objector receives an explanation of the calculation and a copy of the policy statement explaining the appeals procedure. A fee payer who is dissatisfied with the amount of the rebate may appeal to an impartial hearing officer operating under the rules of procedure of the CWA Review Board, or he may appeal directly to the Appeal Board created by the New Jersey statute or he may appeal first to the CWA hearing officer and then to the New Jersey Appeal Board.

Effective February 13, 1981 CWA created a Public Review Board to decide complaints by members and non-members of CWA about rebates of sums paid to the union under union or agency shop contract provisions. The initial members of the Board were the Chairman of the Georgetown University Law Center, the President of Hunter College, and the minister of Peoples' United Church of Christ in Washington, D.C. CWA adopted detailed rules governing the filing of appeals with the Board and the procedures to be followed at hearings by the Board.

As mentioned above, CWA has developed a sophisticated procedure for determining reimbursable expenditures and non-reimbursable expenditures and for apportioning expenditures which are devoted to both reimbursable and to non-reimbursable items. The necessity for developing this procedure arose in the course of an action in the United States District Court in Maryland in which Maryland employees of American Telephone and Telegraph Company and of Chesapeake and Potomac Telephone Company who had paid agency fees sought reimbursement for expenditures not made for collective bargaining, contract administration and grievance adjustment. *Beck v. Communications Workers of America,* 468 F.Supp. 93 (1979). On May 3, 1979, the court referred the matter to Special Master Wilson K. Barnes. The Special Master filed his Report on August 18, 1980, ruling that CWA was entitled to retain 19% of its expenditures and was required to reimburse to the plaintiffs in that case 81% of its expenditures.

After the Special Master issued his Original Report, CWA and various local unions moved to recommit the matter to the Special Master to make additional findings on the basis of new evidence assembled by CWA. The motion was granted and the Special Master took additional testimony and received new exhibits. In his Supplemental Report the Special Master stated, "[t]he Defendants [CWA and various locals] have also accepted the holding that the record-keeping and bookkeeping methods of the Defendants before the filing of the Original Report were not adequate to enable them in a number of instances to meet the required burden of proof by clear and convincing evidence, and generally accept the method of calculations used by the Special Master in reaching the results in the Original Report. It is recognized that the 19 percent of permissible expenditures (and 81 percent of nonpermissible expenditures) continue in effect until the Defendants are able to meet their burden of proof by clear

and convincing evidence that other percentages are appropriate."

CWA sought by its additional evidence to show that it had developed a methodology which enabled it to establish a different (and higher) percentage of expenditures which it was entitled to charge to non-members in the form of agency fees. The new evidence consisted of testimony of and exhibits prepared by experts. The data which CWA has presented in this action are a somewhat modified version of the data presented to the Special Master.

CWA retained Edward C. Bryant, Chairman of the Board of Westat, Inc., a scientific survey research organization. He developed a system of time recording which would be capable of producing estimates of "retainable, nonretainable and administrative time for the employees of CWA." He also collected data by sampling procedures, developed forms and engaged in pretesting the data collections. The work which he performed and submitted to the Special Master is described in the Supplemental Report of the Special Master. This work and certain additional work which he and his firm performed after the Special Master issued his Supplemental Report are described in his affidavit filed in the present action.

Counsel for CWA had provided Bryant with a list of 25 descriptive categories of activities in which CWA engaged.[1] The Westat Report allocated the 25 descriptive categories set forth in footnote No. 1 to five major categories: 1. *Retainable* (Nos. 1–9); 2. *Other Retainable* (Nos. 15 and 23); 3. *Administrative* (Nos. 10–13). The alloca-

tion of time in this category was to be made on the basis of the allocation of the nonadministrative time of each district or department; 4. *Allocable* (Nos. 6, 16, 20, 22 and 25). CWA contended that if the portion of the allocable activity was directly related to the working lives of CWA represented employees, it would be retainable and if the portion of the allocable activity was related to the everyday lives of CWA represented employees as citizens generally, it would be nonretainable; 5. *Nonretainable* (Nos. 14, 17, 18, 19 and 24).

Given these descriptive categories and major categories Westat devised the system described in the Bryant affidavit for determining and analyzing time spent by CWA employees on their various tasks so as to provide a basis for estimating reimbursable (nonretainable) and nonreimbursable (retainable) time.

Harvey J. Nuland, a certified public accountant with the firm of Buchbinder, Stein, Tunick & Platkin, also appeared as a witness before the Special Master. Nuland and his firm had been retained by CWA to recommend a system of apportionment that would distribute or categorize CWA's expenditures as reflected in its accounting system as reimbursable or nonreimbursable. The systems divided by Nuland are described in the Special Master's Supplemental Report and in Exhibits J and K to the affidavit of Emanuel Saxe filed in the present action. Nuland recommended, among other things, that the salaries of the 17 elected Executive Board members of CWA be considered as retainable and not subject to apportionment.

1. The Special Master's Supplemental Report listed the categories provided to Bryant and used in the Westat Report as follows:

*1.* Formulating contract proposals, contract negotiations, and contract ratification; *2.* Handling questions and complaints about working conditions, benefits and contract rights; *3.* Handling grievances and arbitrations; *4.* Other meetings, phone calls, etc. with company representatives; *5.* Reading or discussing background information and news related to wages, working conditions, etc.; *6.* Government agency, board or regulatory body matters; *7.* Demonstrations, leafletting,

strikes about CWA wages, working conditions, etc.; *8.* Steward meetings or training; *9.* CWA schools; *10.* CWA conventions or monthly, area, etc. meetings; *11.* CWA local union meetings; *12.* Local union administration; *13.* Office management and administration; *14.* Meetings or conventions of other labor organizations; *15.* Organizing; *16.* Legislative activities; *17.* Registration and get out the vote activity; *18.* COPE fundraising; *19.* Other political activity; *20.* Community service activity; *21.* Time off—e.g., sick time, vacation; *22.* CWA publications; *23.* Public relations; *24.* International affairs; *25.* Other.

CWA also retained Dr. Emanuel Saxe, a certified public accountant and professor. He was asked to review the reports prepared by Nuland's firm and to determine their compliance with accepted cost allocating standards and thereafter to devise a program based on those standards which, when applied to the audited financial statements of CWA would yield data that would disclose the amount of retainable expenses and the amount of non-retainable expenses. Dr. Saxe devised such a program. It is described in the Special Master's Supplemental Report and in the Saxe affidavit filed in this action.

Plaintiffs in the Maryland District Court action also produced expert witnesses who challenged certain of the methods and conclusions of CWA's experts. It is unnecessary for present purposes to go into the details of their opinions. Suffice it to say, they appeared to be as experienced and competent as CWA's very experienced and competent experts.

The Special Master reviewed the evidence and arrived at a number of conclusions. Those having the most pertinence for present purposes are:

... the Court expected that the record-keeping position of the CWA Defendants at the time of the hearing before the Special Master would be in place and in actual operation so that they could be applied to the specific figures disclosed by the audited financial reports and records. This, however, has not been the case. The CWA Defendants produced evidence to set forth a system of record-keeping and allocation of costs which they hope and expect to apply *in the future.* This is clear from Nuland 1 and Nuland 11, the Westat Report and the Saxe Format Report, as well as from the testimonies of Mr. Nuland, Dr. Bryant and Dr. Saxe, considered *supra,* and particularly at pages 8 through 28 of this Supplemental Report.

b. There appears to be no dispute that the percentage of retainable (19 percent) and nonretainable expenditures (81 percent) held to be applicable in the Original Report continues in effect until modified upon a proper motion by CWA for such modification and the establishment by CWA at the time of hearing on such a motion that amounts in excess of 19 percent of CWA expenditures were properly chargeable *in the future* to the Plaintiffs as Agency Fee Payors.

.    .    .    .    .

The new system designed by CWA experts is generally sufficient subject to the correction of certain defects, supplying certain omissions and being properly monitored and administered.

The Special Master has concluded, and so finds, that the new system as set forth in Nuland 1, Nuland 11, the Westat Report, the Saxe Format Study and in the testimonies of Mr. Nuland, Dr. Bryant and Dr. Saxe is *generally* sufficient, prima facie, to enable CWA to meet its burden of proof as set forth in the Original Report, provided, however, that certain defects and omissions, later mentioned, are corrected or supplied and provided further that the system is properly monitored and administered as later considered.

The Special Master is not unmindful of the various objections forcefully made by counsel for the Plaintiffs. He is however of the opinion that these objections either do not substantially affect the *general* sufficiency of the proposed new system or will be met and overcome by the proper monitoring and administration of the proposed new system.

After the Special Master issued his Supplemental Report on September 14, 1981, Dr. Saxe revised his format designed to enable an accountant to calculate retainable and non-retainable expenses. The first application of the Saxe Format in terms of a rebate calculation was made for the year ending March 31, 1982. That calculation resulted in a special report issued and certified by the accounting firm of Main Hurdman (Exhibit D to the Shepperson affidavit filed in this action). The special report concluded: "In our opinion the schedules referred to previously, present fairly the

retainable (84.98%) and non-retainable (15.02%) expenses for the year ended March 31, 1982, computed on the basis of the Westat study and in accordance with the format developed by Dr. Saxe."

Plaintiffs in the present case have filed the affidavit of Irving B. Ross, a certified public accountant who had participated as an expert on behalf of the plaintiffs in *Beck v. CWA*. Ross challenges the validity of the allocation computed by Main Hurdman on a number of grounds. Among the grounds are:

6. Main Hurdman, however, do not give their opinion on the CWA computation of Retainable Expenditures.

. . . . .

7. Main Hurdman's special report was not prepared for the purpose of determining the portion of CWA's retainable versus non-retainable expenses for the fiscal year. Main Hurdman merely rearranged data provided to them by the CWA in accordance with the format developed by Dr. Saxe. They in fact state "we have performed no additional review or verification procedures".

8. In the Supplemental Report of Wilson K. Barnes, Special Master in the *Beck* litigation, certain changes were recommended in CWA's proposed system. The CWA computation of Retainable Expenses does not meet either its burden of proof or the criteria established by the Court in regard to its

(1) treatment of organizing expenses,

(2) its proper monitoring, and

(3) its timeliness, specifically:

(A) The CWA admits that its report is not in conformance with the Special Master's conclusions with respect to its Organizing Categories.

(B) The Special Master as well as the expert witnesses stressed that monitoring the system is "extremely important." Although WESTAT monitored the data collection plan including interviewing employees on a sample basis, there was no monitoring of the data in terms of verifying that the timekeeping records accurately reflected actual employee activities.

(C) The computation for the year ended March 31, 1982, was not completed until September, 1982. This unreasonable time delay could increase the difficulty of any independent verification because of the risk of document and memory loss.

. . . . .

10. The specific agreed-upon procedures to test the veracity of a computation of retainable expenses should include but not be limited to the following:

(A) Review and testing of the worksheets which compile the retainable information. This procedure would include tests of the mathematical accuracy of the calculations including tracings to individual activity reports.

(B) Development of a program for testing the accuracy of the information contained on the source documents, i.e. the activity reports. This procedure would include the gathering of corroborating evidence which is sufficient, competent and reliable to afford reasonable assurance that the time allocations are proper. Testing of corroborating evidence should include but not be limited to the examination of:

1. Travel vouchers,

2. Employee Job Descriptions,

3. Personnel Files,

4. Correspondence Files,

5. Other Work Progress Reports,

6. Individual Employee Interviews.

11. In connection with *Beck, et al. v. CWA, et al.*, the defendant Union has calculated its retainable versus non-retainable expenses and applied them to the agency fee payment it received from a group of Maryland private sector employees. No evidence has been provided among the *Olsen* documents to demonstrate that the same causal-beneficial relationship exists between the retainable/non-retainable expenses applicable to Maryland private sector employees and New Jersey public sector employees. Consequently, the veracity of any calcula-

tion in this regard lacks a sound accounting basis.

12. In addition to supporting the national CWA effort, the Plaintiff's representative fees are also expended at the district and local levels. The CWA is presently relying on a sampling system designed by the WESTAT Corporation to allocate its retainable and non-retainable expenses. This system is based on the assumption that all CWA districts are relatively homogeneous units. No evidence has been provided among the *Olsen* documents to substantiate that CWA's District retainable versus non-retainable expense bear the same relationship to New Jersey state government employees as they do to American Telephone and Telegraph Company and Chesapeake and Potomac Telephone Company employees in Maryland.

13. Each local makes its own rebate calculation based on guideline instructions from CWA national office. The veracity of all such calculations should be subject to the gathering of similar corroborating evidence as described in 10(B) herein. This factor is more critical in relation to the defendant locals in view of the fact that the suggested rebate calculation forms only require the reporting of detail concerning rebatable expenses and time and not *all* expenses and time. Furthermore, Schedule C of the form which report officers' rebatable time is not the product of contemporaneous recordkeeping and therefore warrant expanded verification procedures.

It is unnecessary and impossible at the present juncture of this lawsuit to determine whether the Main Hurdman computation of retainable and non-retainable expenses is proper for constitutional purposes and for New Jersey statutory purposes. Assuming that a similar computation is made for the period July 12, 1982 to September 30, 1982 to which plaintiffs' demands for rebates relate, CWA's internal hearing procedure and ultimately New Jersey's Appeals Board would have to address that question. The Special Master's Supplemental Report and the Saxe, Bryant and Ross affidavits and the Main Hurdman special report filed in this case demonstrate the complexity of the question and the insurmountable difficulties an objecting employee would encounter were he to seek to challenge the rebate computation.[2]

D. *Plaintiffs' First Amendment Activities:* Each of the plaintiffs in this action is a State employee in a unit for which CWA is the bargaining representative. None of the plaintiffs is a member of CWA and each objects to the deduction of representation fees from his pay as permitted by the New Jersey statute. Each of the plaintiffs has sought to organize resistance to the representation fees among fellow employees, and each has been threatened with disciplinary action as a result of his activities. There follows a recital of the events relating to the plaintiffs who testified at the preliminary injunction hearing.

1. *Olsen:* Plaintiff, Allen Olsen, is employed in the Department of Community Affairs. In May of 1982 he read in the newspapers that employees in the Department who were not CWA members would be required to pay a representation fee. He received an official notice of the deduction from his pay when he received his paycheck on July 15, 1982. On July 10, he had received from CWA a notice of its Demand and Return System.

Olsen disagrees with political and social positions which CWA takes and objected to the fee deducted from his pay for the reason that he had no way of knowing for what purpose the money would be spent. He communicated with the National Right to Work Legal Defense Foundation, Inc. to seek assistance in combatting what he considered to be a deprivation of his rights. The Fund provided Olsen with a specimen protest letter to be sent to the union and to state officials. Olsen showed the letter to

---

**2.** In a memorandum opinion dated March 4, 1983 the Maryland United States District Court adopted with minor modifications the original report of the Special Master as modified by the supplemental report.

his colleagues, and nineteen agreed to join with him in signing the letter and sending it to the President of CWA Local 1039 and to Frank Mason, Director of Employee Relations in the Governor's Office. Copies were mailed to the Commissioner of the Department of Community Affairs, the Chairmen of the New Jersey House and Senate Labor Committees and to the Chairman of PERC.

The letter was dated June 1, 1982. It was written on stationery bearing Olsen's home address. The letter protested the representation fee and asked that the constitutional rights of the signers of the letter be protected. It demanded that the State and CWA provide data to show what costs were incurred by the union for contract negotiation, contract administration and processing grievances.

On June 14, 1982 Mason responded. He alluded to the statute which authorized the deduction of a representation fee, referred to pending litigation which, he said, might affect actions taken by the State, and expressed regret that he was unable to satisfy Olsen's views on the issue.

Not having heard from the President of Local 1039, on June 25, 1982 Olsen, on behalf of the signers of the earlier letter, wrote another letter on his home stationery. It was addressed (and copied) to the same persons as those who received the first letter. The letter repeated Olsen's contentions that the deduction of representation fees was illegal until a proper amount was established in advance and requested that the deductions cease. There was no response to the letter.

Olsen informed his supervisors of his activities and none had any objections.

The persons opposing the representation fees were loosely associated in an organization which they called Committee for a Rational Union Representation Fee. During the first or second weeks in July 1982, Olsen and plaintiffs William Anderson, Peter Yull, and Larry Lang prepared a Status Report addressed to Non Exempt Nonmembers of CWA. The Report stated that there was evidence that the amount of the representation fee was "at least four times as high as it should be." [3] The letter urged that demands for rebates be filed in a timely manner and described certain pending litigation contesting the New Jersey fee plan. A form of demand letter was included. The names of the four signers were typed on the report along with their telephone numbers.

On July 16, 1982, a memorandum was sent to all department managers. Its author was Valerie L. Sunkett, Principal Personnel Assistant, Bureau of Employee Relations. The subject: "Distribution of Literature from Employee Organizations other than the Certified Majority Representative." The memorandum stated:

The Office of Employee Relations has advised us that it has come to their attention that some supervisors and managers have distributed or allowed the distribution of literature from employee organizations other than the certified majority representative. With this in mind, we are advising all managers that there is a long standing State policy and a matter of commitment set forth in the various contracts between the State and the employee majority representative that the State, through its supervisors or managers, will not undertake to distribute any materials from employee organizations other than the majority representative. We are requesting that each manager advise their supervision that in no case should they distribute, post, or allow the distribution or posting of any literature from employee organizations other than the certified majority representatives.

If you have any questions regarding this matter, please contact the Bureau of Employee Relations.

**3.** One can surmise that the calculation was derived from the conclusion of the Special Master in the Maryland District Court case that 81% of the agency fee involved there had to be refunded. The 81% figure was changed to 79% by the District Court after correcting one of the Special Master's calculations.

On or about September 15, 1982 Kenneth J. Horton, Personnel Officer, sent to Olsen a memorandum which read:

We have been informed by the Office of Employee Relations that you have been engaging in the promotion of the interests of the "Committee for a Rational Representation Fee" using State time.

This letter is to advise you that such activity is not permitted if it involves State time, equipment or the distribution of such literature.

The Office of Employee Relations has also urged us to remind you that continuation of this type of activity can lead to disciplinary action.

Olsen's supervisor had been approached a week prior to Olsen's receipt of the September 15 letter and had been asked to write a similar letter to Olsen.

On September 20, 1982 Olsen wrote to Horton, denying implications of misuse of State time and facilities and questioning the procedures which Horton pursued when receiving "third part allegations."

On September 30, 1982 Ms. Nancy Schaefer, Employee Relations Coordinator wrote Olsen to the following effect:

Your memo to Kenneth Horton, Personnel Officer for the Department of Community Affairs was referred to me for response.

The memo of September 15 you refer to did not "imply" misuse of State time and facilities. In fact, it was a misuse of State time and facilities and I directed the Department advise you to discontinue these activities if you had not already done so.

The information was not, as you say, "third hand." In fact your supervisor spoke to you regarding distribution of such material on State property and it is my understanding you did admit to distribution of the leaflet. Your name and work number are clearly printed on the leaflet with an invitation to call you. Such information would be considered "first hand." Use of a State phone for business other than that of the State's is clearly inappropriate.

The Governor's Office of Employee Relations has been the agent for developing and enforcing labor relations policy throughout the State. It has been a long standing policy of the State that distribution of *any* literature on State property at *any* time by *any* organization without the express permission of the State is not allowed.

The Department is aware of the State's policies regarding union activity, as well as permissible activities spelled out in the negotiated agreement. Should you have any further questions regarding this matter please feel free to contact me.

Olsen wrote to Schaefer and asked for a copy of the State's policies concerning union/nonunion activities. Numerous other forms of literature are distributed in State offices by State employees concerning organizations, activities and contributions. Olsen received no reply to his inquiry.

2. *Lang:* Lang is employed in the New Jersey Department of Labor. He pursued a course of action similar to Olsen's.

He first obtained 44 signatures on a letter to the President of Local 1034 and to Frank Mason. It was similar in content to Olsen's first letter. He had received permission from his director to engage in this activity if he did it on his lunch hour, which he did. He distributed copies of the status report urging the filing of requests for rebates at this work place before 8:00 a.m.

On August 11, 1982, the Chief of Personnel Services wrote to Lang stating:

It has come to the attention of this office that you have been using state time to promote the interests of the Committee For A Rational Representation Fee. This letter will serve as notice to you that you must cease and desist from such practice in the future if it involves state time, equipment, supplies, or the distribution of material in state offices.

The Governor's Office of Employee Relations has urged us to remind you that continued activity of this sort can lead to a disciplinary action.

Lang had also become aware of the Valerie Sunkett memorandum of July 16, 1982 concerning the distribution of literature from employee organizations other than the certified majority representative. As a result of these communications, Lang removed all material concerning the representation fee from his office.

3. *Anderson:* Anderson's efforts to persuade fellow employees to contest the representation fee system followed the same course as Olsen's and Lang's. After initial approval of distribution of literature and discussions during lunch hours or breaks, Anderson was directed to stop his activities.

On August 5, 1982 Nancy Schaefer, Employee Relations Coordinator, wrote to Jeffrey Bodholt, Chief, Bureau of Employee Relations, Department of Transportation, as follows:

> Attached is a copy of a leaflet the CWA alleges is being distributed by employees of the State who are part of the "Committee." Please investigate and advise me as to whether the leaflet was distributed on State time and whether or not the employee in question has been receiving phone calls on work time.
>
> I would suggest you advise this employee in writing that such activity is not permitted on State time and continuation of this may lead to discipline.

Attached to the Schaefer memorandum was a copy of the July 15, 1982 Status Report of the Committee for a Rational Representation Fee urging employees to apply for a rebate.

On August 12, 1982, Bodholt wrote to Anderson as follows:

> This is to confirm my telephone conversation of August 10, 1982 wherein I advised you that the "Committee for a Rational Representation Fee" cannot distribute literature on State premises nor can persons accept calls on State telephones during working hours to discuss Committee business. Only the majority representative organization, the Communications Workers of America, has contractual rights to utilize State facilities as outlined in the Union Rights and Representative portion of the contracts.

> If you receive a call at your work telephone from employees interested in the Committee business, please advise the caller to contact you after working hours or on public telephones while you are at lunch, on your own time, or on your rest break. As I understand it, you indicated that the July 15, 1982 information sheet entitled "Status Report" (copy attached) was not distributed on the Department of Transportation premises. Any information the Committee wishes to disseminate can be accomplished off of State premises.

> Your cooperation in this matter is appreciated.

4. *Yull:* Without detailing all the events, Yull experienced treatment similar to that described above. In addition, one episode illustrates the special consideration given to the union with respect to communications to employees.

Pursuant to Article XXVIIC of the various collective bargaining agreements, the union is given the right to maintain a bulletin board at each work place and to distribute literature in central locations. The material which may be posted on the bulletin boards or distributed to employees may concern union matters and matters of concern to unions generally. The only express limitations are that the "material shall not contain anything profane, obscene or defamatory of the State or its representatives and employees, nor anything constituting election campaign material."

At least one union bulletin board was used to post information attacking the Committee for a Rational Representation Fee and threatening those who espoused its goals. The circular involved read as follows:

Fellow Workers:

The National Right to Work Committee, an anti-worker, right-wing organization funded by the worst union busting corporations in America, is behind a drive to weaken your union. A front group of disgruntled State employees calling

themselves "A Committee for a 'Rational' Union Representation Fee" along with a group called "United Professional Employees," is attempting to discredit your union by spreading half truths and feeding on rumors. These cowardly individuals (many of whom are supervisors) refuse to use the Democratic procedures established in our union to resolve controversial issues. They prefer to attack our union—the only organization currently elected by State employees to help us defend our interests as workers. The National Right to Work (*FOR LESS*) Committee and its front groups do nothing but keep working people from getting decent wages and benefits for their families. They try to destroy the only organizations established to protect and defend workers—unions. Unlike unions, these groups are not controlled by workers. They do not hold elections. They are the exact opposite of the Democratic procedures they purport to defend. Recently, these anti-worker groups have been posting material on CWA bulletin boards. This is a violation of your contract. If you witness this happening, get the name of the individual and contact your steward or the Union office. *A grievance will be filed against any supervisor posting anti-union material on these boards, or handing out anti-union material on the job.*
DEFEND YOUR CONTRACT—DEFEND YOUR UNION—DEFEND YOUR FAMILY. JOIN CWA—BUILD YOUR LOCAL—STOP ATTEMPTS TO ATTACK YOUR UNION.

5. *General Observations:* It is quite apparent from the evidence that plaintiffs' activities when opposing the representation fee were consistent with previously permitted conduct by State employees on State property. Most of these activities took place before work or during breaks or lunch hours. Use of the phone was limited in nature and of a kind generally permitted in the offices where they worked. The distribution of literature was an activity in which employees were permitted to engage for other non-employment related causes. Un-

der the collective bargaining agreement, however, the State has agreed that one group of employees (members of CWA) may express themselves on bulletin boards and through the distribution of literature, while non-members may not enjoy the same privilege.

I find that the sole reason plaintiffs were directed to cease their activities on behalf of the Committee for a Rational Representation Fee and were threatened with discipline was because of the ideas and policies which they advocated. Their activities in no way interferred with their work and in no way intruded upon other employees. The State, apparently at the instigation of the union, sought to prevent expression of the views and policies espoused by plaintiffs.

## CONCLUSIONS OF LAW

The court has jurisdiction over this action by virtue of 28 U.S.C. § 1343 to provide remedies for causes of action arising under 42 U.S.C. § 1983.

Plaintiffs, who now seek preliminary injunctive relief, must show: (i) a reasonable probability of ultimate success on the merits of the litigation, (ii) irreparable harm to themselves if the injunction is not granted, (iii) the absence of countervailing harm to other interested persons if the injunction is granted, and (iv) the absence of countervailing public interests should the injunction be granted. *Kennecott Corp. v. Smith,* 637 F.2d 181 (3d Cir.1981).

Three substantive issues must be addressed at this time to determine whether plaintiffs have a reasonable probability of ultimate success on the merits: (i) Did the actions which the state and the union defendants took to prevent plaintiffs from expressing their views through the Committee for a Rational Representation Fee violate plaintiffs' First Amendment rights? (ii) Did I correctly decide in *Robinson v. State of N.J., supra,* that the New Jersey statutory provision permitting the majority representative to use non-members' fees for certain lobbying purposes is unconstitution-

al? and (iii) Does CWA's demand and return system adequately protect plaintiffs' First Amendment rights?[4]

A. *Plaintiffs' Rights to Express Themselves:* As described above, plaintiffs' superiors, upon the urging of union officials, have forbidden plaintiffs to express their views about the representation fee procedures on state property and have threatened them with disciplinary action if they do so. The conclusion is inescapable that this action was taken because of the content of plaintiffs' speech and writings and not because of any interference with their work or the work of any other state employees. The prohibition extends to activities during recess and recreation periods and it extends to activities conducted on all portions of state property—hallways, sidewalks, dining rooms, and social areas as well as offices and other work areas.

It is well established that public employees have protected First Amendment rights. *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The First Amendment prohibits governmental discrimination among viewpoints on particular issues falling within the realm of protected speech. *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951). Such discrimination has occurred in this case. The State has permitted pro-union views to be expressed both on the bulletin board devoted exclusively to union materials and apparently elsewhere. The State has prohibited contrary views from being expressed anywhere or at anytime on state premises. This is a clear violation of plaintiffs' First Amendment rights.

The recent Supreme Court case of *Perry Education Assn. v. Perry Local Educators' Assn.,* —— U.S. ——, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) is instructive. There the Court upheld a collective bargaining agreement provision which gave the exclusive bargaining representative access to the interschool mail system and teacher mailboxes and denied such access to a rival organization. The Court found that the internal mail system was not a public forum and held that exclusive use was necessary to permit the bargaining representative to perform its responsibilities effectively. This reasoning would tend to validate the provision in the contract involved in this case granting CWA the exclusive use of certain bulletin boards in working areas.

The reasoning of *Perry,* however, clearly does not validate the State's actions in the present case which prohibit those opposed to the union's representation fee system from expressing their views anywhere on State property. In fact, the language in *Perry* suggests that the Court would consider such a prohibition unlawful:

> The exclusive access policy applies only to use of the mailboxes and school mail system. PLEA is not prevented from using other school facilities to communicate with teachers. PLEA may post notices on school bulletin boards; may hold meetings on school property after school hours; and may, with approval of the building principals, make announcements on the public address system. Of course, PLEA also may communicate with teachers by word of mouth, telephone, or the United States mail.

—— U.S. at ——, 103 S.Ct. at 952.

> There is, however, no indication that the school board intended to discourage one viewpoint and advance another. We believe it is more accurate to characterize the access policy as based on the status of the respective unions rather than their views. Implicit in the concept of the nonpublic forum is the right to make

---

**4.** At this time it is unnecessary to address the different constitutional and statutory questions which plaintiffs raise as to the propriety of charging non-members for union expenditures for items such as representing employees before the New Jersey Civil Service Commission, union organizational efforts, the union sponsored newspaper, and the CWA "Defense Fund" designed to assist members who go on strike. It may well be that the New Jersey courts first should decide if these are expenses which the New Jersey statute permits to be charged to non-members before a federal court reaches the constitutional issues. *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.

*Id.* at ——, 103 S.Ct. at 957.

Finally, the reasonableness of the limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place. These means range from bulletin boards to meeting facilities to the United States mail. During election periods, PLEA is assured of equal access to all modes of communication. There is no showing here that PLEA's ability to communicate with teachers is seriously impinged by the restricted access to the internal mail system. The variety and type of alternative modes of access present here compare favorably with those in other non-public forum cases where we have upheld restrictions on access.

*Id.* at ——, 103 S.Ct. at 959.

In the present case, unlike *Perry,* plaintiffs were not only excluded from communicating with fellow employees via the bulletin boards, they were excluded from communicating with fellow employees anywhere on State property, regardless of whether the areas constituted public or nonpublic fora. The reason they were so excluded was because they espoused views which were hostile to those of CWA and its members. This is a clear violation of the First Amendment.

■ The statute upon which plaintiffs rely, 42 U.S.C. § 1983, provides a cause of action based upon conduct by a person acting under color of state law which subjects the complainant to deprivation of federally protected rights, privileges or immunities—in this case a deprivation of First Amend-

ment rights of free speech, rights made applicable to the states by the Fourteenth Amendment. Conduct of a private party, not acting against a backdrop of state compulsion or involvement, does not give rise to a § 1983 claim. *Adickes v. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

■ In the present case there can be no doubt that the conduct of the personnel officers and of plaintiffs' supervisors constituted state action. In addition, there was sufficient union involvement with state officials in the actions designed to prevent plaintiffs from communicating their views to constitute the conduct of the union state action for § 1983 purposes. CWA negotiated and entered into the collective bargaining agreement with the State pursuant to a State statute which permitted CWA to become the exclusive bargaining representative for State employees in designated employment units. The agreement (lawfully) gave the union the exclusive right to use certain bulletin boards to advance its interests and views. The union used at least one of these bulletin boards to attack plaintiffs' views. The union then succeeded in persuading state officials to order plaintiffs to cease communicating on State property concerning the representation fee and to threaten disciplinary action if they did. Thus the union and the State acting together deprived plaintiffs of federal rights. This is sufficient to constitute the actions of the union state action within the meaning of § 1983. *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Adickes v. Kress & Co., supra; Henderson v. Fisher,* 631 F.2d 1115 (3d Cir.1980).

■ On this issue plaintiffs have established a likelihood of success on the merits. Deprivation of First Amendment rights constitutes irreparable injury. There are no legitimate interests of the defendants which would be adversely affected by enjoining continuation of the kind of conduct of which plaintiffs complain. The interest of the public would be served by protecting plaintiffs' First Amendment rights.

■ A preliminary injunction will issue enjoining defendants from forbidding plaintiffs to speak or write on State property concerning union or representation fee issues and from disciplining plaintiffs should they engage in such activities and, in the case of the union defendants, from seeking to persuade State authorities to engage in such forbidden conduct. The injunction will be drafted so as to permit the State to comply with its collective bargaining agreement provisions governing CWA's use of bulletin boards and so as to permit reasonable regulations of general application as to the time, place and manner in which State employees may engage in non-work related communications, provided such regulations do not discriminate on the basis of views expressed about union matters, representation fees and employee relations generally.

B. *Lobbying:* In *Robinson, supra,* I held that the provision of N.J.S.A. 34:13A–5.5 c permitting labor organizations to use the representation fees of public employees for lobbying activities designed to foster "policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through collective negotiations with the public employer" violated the First Amendment rights of non-member employees. I concluded that the New Jersey statute went beyond the kind of lobbying to which the Supreme Court has held representation fees may be applied, namely, "subsequent approval [of the collective bargaining agreement] by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process." *Abood v. Detroit Board of Education,* 431 U.S. 209, 236, 97 S.Ct. 1782, 1800, 52 L.Ed.2d 261 (1977).

Defendants in the present case ask that I reconsider my previous ruling. CWA urges two grounds for reconsideration.

First, CWA argues that collective bargaining in New Jersey may lead to an agreement by the parties to lobby for a change in legislation, and that this would,

under my reasoning in *Robinson,* permit a union to use representation fees to lobby to obtain "subsequent approval" of that agreement, *i.e.,* to lobby for legislative changes. If this can be done, so the argument goes, it is irrational to forbid the union to use representation fees to lobby for the legislative changes in the first place. CWA's rationale would permit the union and the employer to insert a provision in a collective bargaining agreement to lobby for any legislation they thought appropriate and then use non-members' fees to lobby for it. I do not understand *Abood* to so hold and I do not believe that a non-member's First Amendment right to refrain from advocating social and political views can be so easily destroyed.

CWA's second argument is more persuasive. It points out that many subjects such as pensions and protection against layoffs which are the subject of bargaining in the private sector are established by State legislation when the State is the employer, and thus, under New Jersey cases such as those cited in *Robinson,* are removed from the bargaining process. In order to achieve improvements in these provisions the union must lobby and, according to CWA, non-members should pay their fair share of the benefits received through the lobbying process.

One problem which this thesis presents is that the range of subject matters which can be brought under the New Jersey statutory umbrella is virtually unlimited. There are few subjects of general concern which cannot be deemed to affect "policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through collective negotiations with the public employer." The breadth of the lobbying which CWA contends is permitted by the statute is suggested by the affidavit filed by CWA of Paul Goldberg, Director of Field Services of the American Federation of State, County and Municipal Employees, AFL–CIO:

Because the employer in the public sector is the state or local government itself,

the Union must both work closely with appointed and elected officials and take positions before legislative bodies on matters affecting public employee wages, hours and working conditions including *budgets, tax reform, civil service reform, collective bargaining rights and legislation, health institutions, pensions, discrimination and civil rights issues affecting employees.*

. . . . .

Examples of the Union's lobbying efforts range from testifying in favor of legislation authorizing *collective bargaining in the public sector, to opposing the effects of deinstitutionalization on employees of public health institutions to advocating tax reform to ameliorate the effects of property tax cutbacks on public sector employees.*

. . . .

Approximately five hundred bills pending in the New Jersey legislature would have a direct impact on collective bargaining and public employee wages, hours and working conditions. Included in the subjects addressed by these bills are *occupational safety and health, workers' "right to know" about hazardous chemicals in their workplace, changes in New Jersey's CAP" law which sets a 5% cap on government budgets and spending and thus limits monies available for public employee wages and benefits, and numerous other measures regarding state services, state aid to local governments and tax revenues.*

(Emphasis added.)

These matters concern many if not most of the principal public issues with which the New Jersey legislature must deal—the extent of collective bargaining rights, the State budget, tax policy, assistance to municipalities, limits on municipal spending, how health care is to be provided and paid for. All, of course, can be said to have some effect upon State employees.

Unions have every right to lobby with respect to these issues. However these issues, involving as they do important questions of public policy, are the subject of intense debate and disagreement. To permit the majority representative to use representation fees to pay for lobbying on these questions is to compel non-members to pay to support policy views which they may consider unwise or abhorrent. If CWA's arguments were accepted, representation fees could be used to lobby with respect to practically all significant legislative questions. There would be practically no limit on the use of representation fees for lobbying purposes. This would constitute a major breach of non-members' First Amendment rights. I do not believe *Abood* contemplated such a result.

■ Consequently I reaffirm the conclusion I arrived at in *Robinson*. As in *Robinson*, the union defendants will be preliminarily enjoined from using any portion of plaintiffs' representation fees for lobbying other than lobbying to secure agency or legislative action required to implement a collective bargaining agreement.

In light of CWA's first argument described above, the order will include language designed to prevent the defendants from evading what I consider to be the intent of *Abood*. Plaintiffs' First Amendment rights cannot be permitted to be lost through the vehicle of provisions in collective bargaining agreements which obligate the employer and the union to lobby for all manner of causes having some effect on public employees. I suggest a provision in the order which would specify that "lobbying to secure agency or legislative action required to implement a collective bargaining agreement" shall be deemed to encompass lobbying designed to secure budgetary and appropriation legislation to provide funds to pay for benefits and programs contained in a collective bargaining agreement. However, I am receptive to suggestions of the parties as to alternative language which would insure conformity with *Abood* by preventing unlimited lobbying with non-members' fees.

C. *CWA's Demand and Return System:* In *Robinson* I found that the demand and return systems of the union defendants in

that case were such that a non-member's fee was taken under circumstances where he did not know in advance of payment and was unable to ascertain after payment whether the fee was used for political and ideological purposes which he opposed. I also found that the demand and return systems which were the subject of that case placed such heavy burdens on the objecting non-members and took such an inordinately long time to complete that in reality it does not constitute a system by which a non-member can recover the portion of the fee paid by him which is used for impermissible purposes. I concluded that the demand and return systems in that case could not protect a non-member's First Amendment rights and that "[t]hese rights can be protected only if there is an advance determination of the amount to which the unions are entitled for collective bargaining services and only if the enforced payments are limited to those amounts." 547 F.Supp. at 1322.

There are substantial differences in the demand and return system in the present case and the systems which were under review in *Robinson.* Here, as a result of the Maryland District Court case, there is in place a complex and highly sophisticated method for allocating expenditures between those which the CWA considers reimbursable to non-members and those which CWA considers non-reimbursable. CWA escrows 40% of the fees paid by objecting non-members. There is formal procedure which CWA has established to hear claims for reimbursement. One does wonder how the busy persons who comprise CWA's outside hearing board can possibly spend the time required to adjudicate properly the complex issues involved in the various claims for refunds arising in the many jurisdictions having differing representation fee statutes. However, the existence of such a board demonstrates CWA's efforts to involve disinterested persons in the process.

The question still remains whether even CWA's more sophisticated system adequately protects the First Amendment rights of objecting non-members. The time lag between filing an objection and resolution of the objection is very great. In order to obtain an authoritative adjudication of the various complex legal and factual issues it is still necessary to pursue intra-union remedies and then to appeal to New Jersey's Board of Appeals and from it to the New Jersey courts. I will defer passing on the constitutionality of this system for the time being.

In *Robinson,* in deference to the important role the union defendants were filling, I did not enjoin forthwith collection of representation fees from the plaintiffs in that case. Instead, I required that a portion of the plaintiffs' representation fees be placed in escrow and provided that if a final hearing were not heard in six months and if within that time there had not been established a representation fee system meeting constitutional requirements, I would entertain an application for additional injunctive relief.

Since I entered the order implementing the opinion in *Robinson* the union defendants in that case have devised new procedures for implementing their demand and return systems which they contend meet constitutional requirements. On May 3, 1983 a hearing is scheduled at which there will be considered, among other matters, the constitutionality of the revised systems. There will be added to the May 3 agenda the question whether CWA's system meets constitutional requirements. If any of the parties in this case wish to submit additional briefs on that question, they may do so on or before April 25. They will also have an opportunity to argue that question on May 3. The decisions I reach in the various cases are obviously interrelated and if there are appeals, the Court of Appeals should have the opportunity to hear all the cases at the same time. I shall try to enter appropriate orders granting or denying injunctive relief in all cases on the same date.

In the meantime, in view of CWA's escrow procedure it is unnecessary to require the escrow of additional portions of plaintiffs' representation fees.

Plaintiffs are requested to submit a form of order in conformity with this opinion.